PHILLIP A. TALBERT
United States Attorney
KATHERINE T. LYDON
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900

TODD KIM
Assistant Attorney General
KRISHNA S. DIGHE
Senior Counsel
STEPHEN J. FOSTER
Trial Attorney
Environmental Crimes Section, U.S. Dept. of Justice
150 M Street NE
Washington, DC 20002
Telephone: (202) 305-0321

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>                    v.<br><br>POWER PERFORMANCE ENTERPRISES, INC.,<br><br>                              Defendant. | CASE NO. 2:22-CR-0043 JAM<br><br>PLEA AGREEMENT<br><br>DATE: March 15, 2022<br>TIME: 9:30 a.m.<br>COURT: HON. JOHN A. MENDEZ |

## I.     <u>INTRODUCTION</u>

### A.     <u>Scope of Agreement.</u>

The Information in this case charges the defendant, Power Performance Enterprises, Inc.

("PPEI"), with violations of 18 U.S.C. § 371 – conspiracy to violate the Clean Air Act ("Count One")

and 42 U.S.C. § 7413(c)(2)(C) – tampering with a monitoring device or method required by the Clean

Air Act ("Count Two").  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California and the Environmental Crimes Section of the Environment and Natural Resources Division (collectively, the "government" or the "United States") and the defendant regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and the Environmental Crimes Section of the Environment and Natural Resources Division and cannot bind any other federal, state, or local prosecuting, administrative, civil enforcement, or regulatory authorities.

**B.**  **Court Not a Party.**

The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of the defendant, including activities which may not have been charged in the Information.  The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statutes, the defendant cannot, for that reason alone, withdraw its guilty plea, and it will remain bound to fulfill all of the obligations under this plea agreement.  The defendant understands that neither the prosecutors, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence it will receive.

## II.    DEFENDANT'S OBLIGATIONS

**A.**  **Guilty Plea.**

The defendant will plead guilty to Counts One and Two.  The defendant agrees that it is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case.  The defendant understands and agrees that it will not be allowed to withdraw its plea(s) should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by it in signing this Agreement, including the

factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

1.    Waiver of Indictment:

The defendant acknowledges that under the United States Constitution it is entitled to be indicted by a grand jury on the charges to which it is pleading guilty and that pursuant to Fed. R. Crim. P. 7(b), it agrees to waive any and all rights it has to being prosecuted by way of indictment to the charges set forth in the Information. The defendant agrees that at a time set by the Court, it will sign a written waiver of prosecution by Indictment and consent to proceed by Information rather than by Indictment.

2.    Package Agreement:

The defendant acknowledges and understands that the plea offer made to it here by the government is a "package offer." That is, the defendant understands that the offer made to it is conditioned on co-defendant KORY B. WILLIS pleading guilty according to the terms of his respective plea offer. The defendant understands that if its co-defendant declines, refuses or fails to plead guilty according to his respective offer, then, at the option of the government, the defendant will not be allowed to enter a plea of guilty to the offer made to it by the government. Additionally, if co-defendant WILLIS fails or refuses to enter his plea according to his respective offer and the defendant has already entered its plea, then this plea agreement is voidable at the option of the government. In its sole discretion, the government has the ability to withdraw from the plea agreement with the defendant and pursue the original charges as to this defendant. However, if the government does so, the defendant's waiver of its rights under Rule 11(f) and Fed. R. Evid. 410, as set forth in Section II.A herein, will not operate.

Recognizing that this is a package offer, the defendant confirms that it has not been threatened, pressured, or coerced by any other person, including the co-defendant, to enter into this plea agreement. The defendant also confirms that it enters into this plea agreement voluntarily because it is in fact guilty of the offense(s) to which it is pleading guilty.

**B.    Fine.**

The defendant agrees to pay $1,550,000 as a criminal fine, jointly and severally with his co-defendant, WILLIS.  The defendant agrees the fine will be apportioned between the counts as follows: for Count One (conspiracy) the defendant will pay $1,350,000, jointly and severally with its co-defendant, WILLIS; and for Count Two (tampering) the defendant will pay $200,000, jointly and severally with its co-defendant, WILLIS.  Payment of the fine shall be by cashier's or certified checks made payable to the Clerk of the Court.  Defendant agrees payment shall be made in three installments, as follows:

> 1)    The first payment, of $516,666.67, will be made within one week of entry of plea.

> 2)    The second payment, of $516,666.67, will be made within one year of entry of plea.

> 3)    The third and final payment, of $516,666.66, will be made within two years of entry of plea.

The defendant further agrees that it will not seek to discharge the obligation to pay any part of this criminal fine in any bankruptcy proceeding.

The defendant understands that this plea agreement is voidable at the option of the government if it fails to pay the stipulated fine as required by this plea agreement.

The defendant further acknowledges that this criminal fine will be in addition to the $1,550,000 civil penalty amount it and its co-defendant, WILLIS, will be obligated to pay pursuant to the civil Consent Decree entered into by the defendant and the Department of Justice ("Consent Decree"), attached hereto as Exhibit B.

The parties agree that the criminal fine and civil penalty amounts are negotiated figures based on the defendants' current abilities to pay.

**C.    Special Assessment.**

The defendant agrees to pay a special assessment of $800 ($400 per count) at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.  The defendant understands that this plea agreement is voidable at the option of the government if it fails to pay the assessment prior to that hearing.

D.    **Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).**

If the defendant, cooperating or not, violates this plea agreement in any way, withdraws its plea, or tries to withdraw its plea, this plea agreement is voidable at the option of the government. If the government elects to void the agreement based on the defendant's violation, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. A defendant violates the plea agreement by committing any crime or providing or procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct constituting obstruction of justice. Varying from stipulated Guidelines application or agreements regarding arguments as to 18 U.S.C. § 3553, as set forth in this agreement, personally or through counsel, also constitutes a violation of the plea agreement. The government also shall have the right (1) to prosecute the defendant on any of the counts to which it pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge. The decision to pursue any or all of these options is solely in the discretion of the government.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement. The determination of whether the defendant has violated the plea agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,

whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

### E.    Asset Disclosure.

The defendant agrees to make a full and complete disclosure of its assets and financial condition, and will complete the United States Attorney's Office's "Authorization to Release Information" and "Financial Affidavit" within five weeks from the entry of the defendant's guilty plea, including supporting documentation. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that if it fails to complete truthfully and provide the described documentation to the United States Attorney's Office within the allotted time, it will be considered in violation of the agreement, and the government shall be entitled to the remedies set forth in section II.D above.

### F.    Probation.

Defendant agrees it will be placed on organizational probation for a minimum period of five years from the date of sentencing pursuant to 18 U.S.C. § 3561(c)(1) and U.S.S.G. §§ 8D1.1 and 8D1.2. The terms of probation shall include the following specific provisions, in addition to the Court's standard conditions:

1)    No further environmental violations. Defendant will commit no further violations of federal state, and local environmental laws.

2)    Payments. Defendant shall make payment in full of the monetary amounts set forth herein.

3)    Environmental compliance. Defendant shall fully comply with the civil Consent Decree. Any reports or notifications required by the Consent Decree or this Agreement shall be submitted simultaneously via electronic means by Defendant to all undersigned government counsel.

### G.    Corporate Authorization.

Defendant PPEI represents that it is authorized to enter this Plea Agreement. At the time of signing, Defendant shall provide to the United States a written corporate resolution, to be filed with the

PLEA AGREEMENT

6

Court, in the form of notarized legal documents certifying that Defendant is authorized to enter into and comply with all of the provisions of this Plea Agreement. The resolutions shall certify that all corporate formalities have been observed. A duly authorized corporate officer will attend the entry of plea and sentencing hearings.

### III.    THE GOVERNMENT'S OBLIGATIONS

#### A.    Dismissals/Other Charges.

The government agrees not to bring any other charges arising from the conduct outlined in the Factual Basis attached hereto as Exhibit A.

#### B.    Recommendation as to Fine Amount.

The government agrees to recommend the stipulated criminal fine of $1,550,000, as described above in section II.B.

#### C.    Use of Information for Sentencing.

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, its attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

### IV.    ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offenses to which the defendant is pleading guilty. With respect to Count One, conspiring to violate the Clean Air Act in violation of 18 U.S.C. § 371, the elements are:

- First, beginning on or about February 27, 2009, and ending on or about September 16, 2019, there was an agreement between two or more persons to commit at least one crime as charged in the Information;

- Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

- Third, one of the members of the conspiracy performed at least one overt act within five years prior to the entry of this plea for the purpose of carrying out the conspiracy.

With respect to Count Two, Tampering with a Monitoring Device or Method Required by the Clean Air Act, the elements are:

- First, the defendant was a person;
- Second, the defendant tampered with or rendered inaccurate a monitoring device or method;
- Third, the monitoring device or method was required under the Clean Air Act; and
- Fourth, the defendant acted knowingly.

The defendant fully understands the nature and elements of the crimes charged in the Information to which it is pleading guilty, together with the possible defenses thereto, and has discussed them with its attorney.

## V.    **MAXIMUM SENTENCE**

### A.    **Maximum Penalty.**

The maximum statutory sentence with respect to Count One is five years of incarceration, a fine of $500,000 or twice the gross gain or loss, a five-year period of organizational probation and a special assessment of $400. The maximum statutory sentence that the Court can impose on the defendant with respect to Count Two is two years of incarceration, a fine of $500,000 or twice the gross gain or loss, a five-year period of organizational probation, and a special assessment of $400.

### B.    **Violations of Probation.**

The defendant understands that if it violates a condition of probation at any time during the term of probation, the Court may revoke probation.

## VI.    **SENTENCING DETERMINATION**

### A.    **Statutory Authority.**

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The

defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

Defendant understands and acknowledges that the Sentencing Guidelines, including Chapter Eight that provides guidance for the sentencing of corporate defendants, will be considered by the court except that pursuant to U.S.S.G. §§ 8C2.1 and 8C2.10, the Guidelines that pertain to the sentencing of organizations do not determine the fine range in cases involving environmental crimes or obstruction of justice. Instead, the fine is to be determined under 18 U.S.C. §§ 3553 and 3571. All other sections of Chapter Eight of the Sentencing Guidelines that are applicable to corporate defendants are applicable to this case, including provisions for probation.

## VII.    WAIVERS

### A.    Waiver of Constitutional Rights.

The defendant understands that by pleading guilty it is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on its behalf; (f) to confront and cross-examine witnesses against it; and (g) not to be compelled to incriminate itself.

### B.    Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal its guilty plea, conviction, and sentence. The defendant agrees as part of its plea(s), however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum(s) for the offense(s) to which it is pleading guilty. The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty. The defendant

1  specifically gives up the right to appeal any order of restitution the Court may impose.

2      Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if

3  one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the

4  statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant

5  understands that these circumstances occur infrequently and that in almost all cases this Agreement

6  constitutes a complete waiver of all appellate rights.

7      In addition, regardless of the sentence the defendant receives, the defendant also gives up any

8  right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any

9  aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

10      Finally, the defendant gives up any right to withdraw its plea or seek to vacate its conviction

11  based on any changes in the law after the execution of this plea agreement, as it agrees its conduct was

12  unlawful at the time it occurred.

13      Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

14  attempts to vacate its pleas, dismiss the underlying charges, or modify or set aside its sentence on any of

15  the counts to which it is pleading guilty, the government shall have the rights set forth in Section II.D

16  herein.

17      **C.    Waiver of Attorneys' Fees and Costs.**

18      The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

19  119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

20  investigation and prosecution of all charges in the above-captioned matter and of any related allegations

21  (including without limitation any charges to be dismissed pursuant to this plea agreement and any

22  charges previously dismissed).

23      **D.    Waiver of Venue**

24      The defendant understands that as to each count charged against it, the law gives it a right to a

25  trial in the state and district where the count was allegedly committed. To the extent it is applicable, the

26  defendant agrees to waive this right and any and all objections as to venue for the charges filed in this

27  case.

28

1

### VIII.    ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

### IX.    APPROVALS AND SIGNATURES

#### A.    Defense Counsel.

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: Jan 13, 2022

_____
STACEY MITCHELL
Attorney for Defendant

#### B.    Defendant:

I have been authorized by a corporate resolution of Defendant PPEI to sign this plea agreement. On behalf of PPEI, I have read this plea agreement and carefully reviewed every part of it with PPEI's attorney. PPEI understand this agreement and voluntarily agrees to it. Further, defendant PPEI has consulted with its attorneys and fully understands its rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to PPEI, other than those contained in this plea agreement. In addition, no one has threatened or forced PPEI in any way to enter into this plea agreement. Finally, PPEI is satisfied with the representation of its attorney in this case.

Dated: 1/13/22

_____
POWER PERFORMANCE ENTERPRISES, INC.
By president and authorized representative
KORY B. WILLIS
Defendant

PLEA AGREEMENT

11

1

## C.     <u>Attorney for United States:</u>

2    I accept and agree to this plea agreement on behalf of the government.

3    Dated: 1/13/22                          PHILLIP A. TALBERT
                                              United States Attorney
4

5                                            _____
                                             KATHERINE T. LYDON
6                                            Assistant United States Attorney

7

8                                            TODD KIM
                                             Assistant Attorney General
9                                            Environment and Natural Resources Division

10                                           _____ for
11                                           KRISHNA S. DIGHE
                                             Senior Counsel
12                                           Environmental Crimes Section

13

14                                           _____
                                             STEPHEN J. FOSTER
15                                           Trial Attorney
                                             Environmental Crimes Section

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

EXHIBIT "A"
Factual Basis for Plea(s)

Were this matter to proceed to trial, the United States would prove the following beyond a reasonable doubt:

*Introduction*

From its incorporation on February 27, 2009, through today, POWER PERFORMANCE ENTERPRISES, INC. ("PPEI") was a business chartered in Louisiana and KORY WILLIS was its president and sole shareholder. PPEI did business throughout the United States, including in the Eastern District of California. From PPEI's incorporation until September 16, 2019, PPEI and WILLIS were among the nation's most prominent developers of custom "tuning" or "tunes." "Tunes" were, generally, alterations to the electronic code that vehicles use to control, among other things, fuel delivery, power parameters, and emissions. According to WILLIS in 2018, PPEI was the biggest custom tuning company in the world and had been for years. PPEI had approximately 28 employees. PPEI and WILLIS were well known for their custom delete tunes, software programs which allow a "deleted" truck—a vehicle that has had its emissions controls removed—to run seemingly normally.

*Background*

"Deleting" a vehicle means to remove a vehicle's emissions control equipment, installed by the vehicle's manufacturer to meet emissions limits required under the Clean Air Act. For diesel engines, this equipment often includes a diesel particulate filter (DPF), a selective catalytic reduction (SCR) system, an exhaust gas recirculation (EGR) system, and a diesel oxidation catalyst (DOC). Many of those emissions controls are housed in the vehicle's exhaust pipe, so the first step of deleting a vehicle is often to remove the exhaust pipe. Drivers seek to remove emissions controls for reasons including increasing horsepower/performance and avoiding maintenance costs.

However, vehicles are designed to not run properly with the emissions components removed. When the above-mentioned emissions controls are removed, the vehicle's On-Board Diagnostic System (OBD) will detect and flag a malfunction in the emissions controls.[1] The OBD will then activate the check engine light and may put the vehicle into "limp mode," which prevents the vehicle from running normally.

After removing a vehicle's emissions systems, three broad categories of products are necessary to make the vehicle run:

1) Hard parts, often sold as part of "delete kits." The simplest example of a delete hard part is a "straight pipe" (a replacement for the original exhaust pipe with all of the emissions controls removed).

2) Software known as "delete tunes," produced by companies such as PPEI. Delete tunes tamper with the OBD's monitoring function by tricking the OBD to prevent it from detecting the removal of emissions controls and thus enable the vehicle to continue to operate as though its emissions controls remained installed.

---

[1] The OBD is a monitoring device or method required by the Clean Air Act. *See* 42 U.S.C. § 7521(m)(1); 40 C.F.R. §§ 86.010-18 and 86.1806-05.

3) A "tuner" or tuning platform to run or install the tunes, which can be a physical box/device or a cloud-based system. A tuner or tuning platform interfaces with the vehicle's computer and OBD that control and monitor various vehicle functions.

Deleting a truck causes its emissions to increase dramatically. For example, for a fully deleted truck which has had all emissions equipment removed, EPA testing quantified the increased emissions as follows: NOx increased 310 times, non-methane hydrocarbons increased 1,400 times, carbon monoxide emissions increased 120 times, and particulate matter increased 40 times. Partial deletions (short of a full delete) may yield lesser emissions increases. EPA's Air Enforcement Division released a report in November 2020 finding that more than half a million diesel pickup trucks in the United States—approximately 15% of all diesel trucks that were originally certified with emissions controls—have been illegally deleted.

Diesel emissions include multiple hazardous compounds and deleteriously impact human health and the environment. Diesel emissions have been found to cause and worsen respiratory issues like asthma and lung cancer. One study indicated that 21,000 American deaths annually are attributable to diesel particulate matter soot. Exposure to polluted air *in utero* has been associated with a host of problems with lifelong ramifications including low birth weight, preterm birth, autism, brain/memory disorders, and asthma.

*Counts One and Two*

With respect to Count One, from February 27, 2009, through September 16, 2019, WILLIS and PPEI, through its agents and employees, agreed with each other and others, within and outside PPEI, to violate the Clean Air Act in the Eastern District of California and elsewhere. Specifically, WILLIS and PPEI agreed to violate the Clean Air Act by writing and selling delete tunes which tampered with vehicles' OBDs and enabled deleted vehicles to run normally with their emissions controls removed. WILLIS was PPEI's primary tune writer and wrote tunes (software) to enable deletion of various diesel truck makes/models/years using various tuners and tuning platforms.

WILLIS was responsible for determining what types of products PPEI sold, what businesses PPEI partnered with, and how PPEI marketed itself. WILLIS and PPEI reached agreements with a number of companies who manufactured hard parts and who manufactured tuners or tuning platforms to sell their products bundled together. WILLIS and PPEI also formed agreements with end users to whom they sold PPEI delete tunes and other delete products. After a sale to an end user, whether the sale was made by PPEI or by a company PPEI partnered with, WILLIS and PPEI often liaised directly with the end user to provide technical assistance to facilitate the download of the delete tunes and to modify the base files to suit the end user's custom vehicle setup. WILLIS and PPEI were aware that PPEI products were used in connection with removal of emissions control equipment and tampered with OBDs. WILLIS and PPEI were further aware that PPEI products were used on public roads and that such use was widespread. At times, WILLIS and PPEI characterized their delete products as for "racing" and/or included disclaimers in their marketing materials indicating that their products should be used only in off-road settings, but WILLIS and PPEI knew the bulk of their market during the period of 2009 through September 16, 2019, was diesel truck drivers who used PPEI products on public roads, not racetracks. WILLIS and PPEI also counseled customers on how to evade state emissions tests.

WILLIS and PPEI formed agreements and arrangements with companies in the aftermarket delete device industry to sell their products together, including at least one company in the state and

Eastern District of California.  Below are two examples (though PPEI partnered with many companies beyond these two):

- COMPANY A produced hard parts used to delete diesel vehicles.  COMPANY A often sold its products directly to customers bundled with PPEI delete tunes (and tuners or tuning platforms produced by other companies).  The products would then be "drop-shipped."  Typically, COMPANY A would bill the customer for the whole sale and ship the customer the hard parts, and PPEI would send its delete tunes (usually along with and/or loaded on the tuner or tuning platform) directly to the customer and bill COMPANY A.  Between 2015 and 2019 alone, COMPANY A paid PPEI more than a million dollars for products purchased.

- COMPANY B produced a popular tuning platform.  PPEI provided tuning to customers through the platform produced by COMPANY B.  The setup process for PPEI and COMPANY B's product after the customer made the purchase involved the customer creating an account and adding kory@ppei.com as the point of contact.  This resulted in COMPANY B sending an automated email to WILLIS containing details about the vehicle and inviting PPEI to "view the vehicle and add custom ECU Profiles for it from your profile page."  The investigation has uncovered thousands such emails, many of which WILLIS forwarded to other PPEI employees, such as PPEI EMPLOYEE A and PPEI EMPLOYEE C.  The emails reflected that many of the vehicles were deleted, including with products from COMPANY A and others.  PPEI and WILLIS promoted COMPANY B's product.  For example, PPEI EMPLOYEE A praised COMPANY B's product to PPEI customers as "a universal device/platform that is used for tuning multiple vehicle types" and PPEI EMPLOYEE A advised a different customer: "With [COMPANY B], you have access to tuning for virtually any upgrade performed on the truck at any time, free of charge.  This includes emissions present and emissions removed tuning!"  Separately, in response to a customer seeking guidance selecting a tuning platform for a truck he used for towing and snow plowing and which he planned to delete, PPEI EMPLOYEE A assured the customer: "When you purchase [COMPANY B product] with a support pack, it comes with both emissions present and emissions removed (off-road tuning)."

PPEI cultivated relationships with "Wholesale Distributors" and "Authorized Dealers" who promoted and sold PPEI delete tunes as well as other delete products such as hard parts, tuners, and tuning platforms at prices PPEI set.  PPEI EMPLOYEE B served as PPEI's "dealer representative" and focused on building and maintaining relationships with distributors and dealers. When end user customers required technical support, PPEI instructed distributors and dealers to attempt to work through the problem with their customer, then to email one of PPEI's technicians with all the details.  If one of the PPEI technicians was unable to fix the problem the issue would be escalated to WILLIS.  PPEI offered bulk promotions which helped dealers sell delete products more efficiently.  For example, in August 2017, PPEI EMPLOYEE B offered his dealers the option of buying bulk COMPANY B support profiles. In the email announcing the bulk option, PPEI EMPLOYEE B noted: "So the beauty of the [COMPANY B tuning platform] is that most of your customers will be getting a basic (intake, exhaust, lift pump, egr delete) all of these profiles are available on the cloud (server) and ready to flash into a truck as soon as its plugged into a truck basically. . . .  So please take advantage of purchasing in

bulk so the customer and yourself isn't waiting for PPEI to enable a profile for a customer on a Saturday afternoon when PPEI is closed."[2]

In some instances, PPEI employees were careful with language and/or employed disclaimers in efforts to insulate PPEI from the illegality of facilitating deletes. For example, in a call between an agent acting in an undercover capacity and PPEI, the undercover agent asked PPEI EMPLOYEE B, "do you guys have dealers or recommend shops for deletes?" PPEI EMPLOYEE B responded: "We can't really say that over the phone. Can't be like, this shop will do a delete. We just say this is our dealer in your location. And then you go there and then that's on this dealer or whoever guy that installs. That's the reason we don't do installs or we don't touch trucks is because the 'D' word is such a- such a-….." In December 2018, a dealer emailed WILLIS, PPEI EMPLOYEE A and PPEI EMPLOYEE B on behalf of one of his customers requesting specific "new tunes so we can get this truck on the road." PPEI EMPLOYEE A responded that he had loaded the requested delete tunes and then added a disclaimer acknowledging the illegality of getting the truck on the road: "Profiles added. Please be advised that per your purchase, the emission removed profiles are strictly for off-road competition/race use only and the use of this vehicle on a legal roadway (if emissions are removed) is strictly prohibited."

However, while WILLIS and PPEI sometimes referred to delete tunes as "race tunes" or "off road tunes," emails reflect the deleted vehicles the tunes were loaded onto were not racecars and were, instead, driven on public roads. WILLIS and PPEI acknowledged in direct communications with customers that PPEI's delete tunes (also known as "emissions removed" tunes) were intended for and installed on "daily drivers," a term used to refer to the vehicles that customers drove on a daily basis. Customers often explained they needed delete tunes suitable for towing, which is inconsistent with racing use and an indication the tuned deleted vehicles would be used on public highways. Numerous written communications explicitly or tacitly acknowledged that emissions controls would be removed from on-road, non-racing vehicles. For example:

- In June 2017, WILLIS emailed a customer a tune with a message acknowledging that the tune was "very uncomfortable to daily drive with but we are just trying to get a good racetune and then we'll smooth it out a bit."
- In June 2017, and again in January 2018, a customer emailed WILLIS about problems he was having with his truck, which he admitted featured a deleted EGR, among other alterations. The customer wrote he had recorded test logs for PPEI to review "but at about 70 mph I hit a bump on a bridge and it felt like the RPMs jumped around a bit" and that another log did the same thing "when I crossed another bridge." The customer wrote, "when I get the new set of tunes I'll find a better road" to record a log. WILLIS and PPEI EMPLOYEE C sent updated tunes custom-calibrated to this particular deleted truck.
- In September 2017, a customer emailed WILLIS that he was having an issue with his tune, specifically that his truck started blowing smoke when he slowed down and then accelerated at a stop light. WILLIS asked him to confirm he had fully deleted the EGR, which the customer did confirm. WILLIS forwarded the email to PPEI EMPLOYEE C, PPEI's Lead Tech, with a note that the customer could send a log of the problem.
- In January 2018, a customer reached out to PPEI seeking specific instructions on how to install the tune on his 2013 Ram truck, which featured a COMPANY A EGR delete kit, a

---

[2] All quoted misspellings and grammatical errors appear this way in the original quoted documents, unless otherwise noted.

DPF delete kit by another company, and a COMPANY B tuning platform. The customer noted "I'm not looking for extra horsepower, I just want the ECM to forget all those emissions sensors ever existed so that I get no Check Engine Light." PPEI EMPLOYEE C sent specific instructions to install the tunes, including what to select for "emissions removed" tuning.

- PPEI indicated it was willing to provide assistance with deleted trucks after owners referenced "freeway" speed driving and "in town" driving.
    - o For example in March 2018, a customer emailed a PPEI support email address and PPEI EMPLOYEE C "my pickup started to lag during exceleration at freeway speed" and other operation issues and noted "I'm trying to figure out if its just a bug between the tune and my pickup or whats going on, at this point ive done egr delete dpf delete throttle valve delete . . . [.]"  PPEI EMPLOYEE A ultimately responded indicating "we can help diag the issue, please record a datalog and send to us!"
    - o Also in March 2018, a different customer emailed PPEI Employee A regarding trouble codes on his pickup, noting "all of the driving has been in town and some highway (60 mph or less)."  PPEI EMPLOYEE A responded "We will check this out. make sure your EGR and throttle valve are disconnected."  The customer confirmed: "Yes those parts are removed."
- PPEI EMPLOYEE A corresponded in April 2018 with a customer who explained he was looking for a "daily light tow" non-delete tune for his pickup truck. The customer explained to PPEI EMPLOYEE A that he "drove around town for a day then took a 500 mile round trip with a 2500 pound trailer" with one of PPEI's emissions-on tunes. In October 2018, the same customer contacted PPEI EMPLOYEE A explaining he really liked the tune they had discussed previously, and, "I am going to pull the trigger on the delete soon, can you please update my files to include this same tune with no emissions?" PPEI EMPLOYEE A responded, "You actually have these profiles available to you already in your ECU profiles on the app."
- In June 2018, a customer emailed WILLIS regarding a truck with a "fully deleted egr" which he used "for towing only and tow 18k in Colorado so a lot of 6% grades for miles."  WILLIS forwarded the email to PPEI EMPLOYEE A with instructions to "get him on a ticket and all up to date there so I can address his issues."
- In February 2019, a customer and PPEI EMPLOYEE A corresponded via email regarding a vehicle the customer was using to pull a trailer. In response to the customer's request for recommendations, PPEI EMPLOYEE A suggested an "EGR delete" among other alterations.

WILLIS and PPEI explicitly discussed tuning deleted trucks with end-user customers and provided detailed assistance.

- In November 2017, a customer wrote PPEI that "I will be deleting the truck so I need the 'off road' tune. . . I'm a returning customer too, deleted and tune[d] my ecodiesel Jeep with yalls help a couple years ago, couldn't be happier and I'm hoping for the same with this Ford."  The customer also asked: "Is 'hiss at idle' versus 'rumble at idle' an option for my Truck?  I really like the way the older psd 6.0s sound with the "hiss at idle'."  PPEI EMPLOYEE A and PPEI EMPLOYEE B assisted him and provided a custom delete tune featuring a "CUSTOM hiss."

- PPEI employees frequently provided technical assistance to customers regarding their deleted diesel trucks, like a November 2017 instance in which PPEI EMPLOYEE A, PPEI EMPLOYEE B, AND PPEI EMPLOYEE C were all on emails assisting a customer who stated he had purchased PPEI tuning and the COMPANY B tuning platform before deleting his truck.  The correspondence indicated the customer was a hobbyist rather than racer, as he had "purchased [the COMPANY B PRODUCT] for my truck . . .from a local shop" and watched "videos" on how to use it.  Ultimately PPEI EMPLOYEE A and PPEI C escalated the technical issue to "Korys to-do-list[.]"
- PPEI sometimes suggested deleting trucks even when the customer had expressed no interest in removing emissions controls.  In January 2018, a dealer emailed PPEI EMPLOYEE A about a customer having some problems with her truck running an "emissions present" tune on the COMPANY B tuning platform.  PPEI EMPLOYEE A suggested a particular delete tune, to which the dealer responded "But this truck has emissions on it.  100% stock."  In subsequent emails, PPEI EMPLOYEE A inquired, "What exactly is this truck doing on the emissions present tunes?  Does the truck still have all of its emissions intact?" and asked, "Any interest in deleting?"  PPEI EMPLOYEE A forwarded the chain to PPEI EMPLOYEE C, noting "Customer is not willing to delete in order to resolve" the issue.
- In June 2018, a customer reached out to PPEI EMPLOYEE A, providing details about his 2015 Ram truck and asking, "Can you please advise me on everything I'd need to do a complete delete and [shift-on-the-fly] tuning with towing and quiet exhaust in mind?"  The customer advised he had a tuner produced by COMPANY B.  PPEI EMPLOYEE A responded that he was happy to assist and provided a link to PPEI products compatible with COMPANY B's tuner.
- In July 2018, a customer emailed PPEI EMPLOYEE A: "What tune should I be running I deleted the DPF Filter ni unplugged the egr n throttle valve the cat is still on the truck[.]"  PPEI EMPLOYEE A responded: "The cat cannot stay on the truck.  ALL factory exhaust equipment must be removed if you are removing your DPF and installing off-road tuning. Load any "no emissions" profile."

Customers sent photographic feedback to PPEI depicting the emissions impact of their vehicle after delete tuning.  For example, in July 2017 a customer shared the following images with the PPEI_tuning Instagram account after deleting his truck with COMPANY A delete kits and PPEI tunes. PPEI_tuning Instagram account posted an image of the same truck, tagging the customer, in September 2017.



WILLIS and PPEI communicated directly with end users about cheating state emissions tests after deleting their trucks. State emissions tests are only required for vehicles registered to drive on public roads.

- In July 2017, a customer asked WILLIS whether he would be able to pass emissions in southeast Wisconsin with delete tunes he had purchased from PPEI. WILLIS said he had "no clue" and "it would be a super conflict with the epa if we try to make delete files pass…" Despite acknowledging that it would be a "super conflict" to attempt to impede detection by state emissions tests, when the same customer asked if WILLIS would be able to provide a stock tune so that the customer could put his stock exhaust pipe back on in order to pass the emissions test, WILLIS responded: "Yes sir 100%!"

- In March 2017, a customer emailed PPEI EMPLOYEE C a question: "I got a '15 Powerstroke gonna be straight piped with the [third party company] STAGE 2 INTAKE and your [COMPANY B tuning platform] and a lift pump to start with. Is it necessary to do the egr delete and ccw delete for the longevity of the truck? I live in a smog enforced county so I would have to put it back to stock every two years[.]" PPEI EMPLOYEE A responded: "In your situation I recommend leaving the egr in place and simply unplugged the sensors with emissions removed tuning and exhaust installed. Then we you have inspection, simply plug the sensors back in."

- In May 2017, a customer who had purchased PPEI tunes for his 2007 vehicle emailed PPEI: "Time has come to smog the truck. Can you send me instructions how to reprogram the truck with the stock tune?" PPEI EMPLOYEE A responded: "Yessir just send me the stock tune that you read out prior to programming and I will send it back as a flashable file! Then you will simply install your emissions equipment!" The next day, PPEI EMPLOYEE B sent a follow up message clarifying and reiterating: "You can always just flash the truck back to stock at the dealer and then install your emissions equipment! Then simply flash your tuning back on afterwards!"

- In May 2017, a customer who needed to "pass emissions every other year" emailed with a detailed question about how to pass both a visual check and "OBD II examination of the truck systems on a delete tune?" PPEI EMPLOYEE A responded: "My recommendation will be to keep your factory exhaust in one piece when removing and replace with a full 4 inch system, leave DEF system intact. Leave EGR intact and simply unplug both systems. Then when it comes time to test for emissions, load emissions present tune, put factory exhaust back on, plug EGR and DEF back in."

PLEA AGREEMENT                                      A-7

1

2

3

4

• In September 2017, a customer with an F350 truck emailed seeking help: "I'm due this month for my Massachusetts state Emissions testing, can I leave the [COMPANY B PRODUCT] in but just put it to position 1 or take it right out so I can get my sticker?" PPEI EMPLOYEE A responded that PPEI did not accommodate tuning that could comply with emissions testing. But, he added, "In this scenario I would recommend loading a re-turn to stock profile" and sent instructions on how to do that.

5

6

7

8

9

10

11

WILLIS and PPEI reached the top of the delete tuning market, tuning over 175,000 vehicles according to WILLIS in an interview with an industry podcast. WILLIS also claimed PPEI had over 100,000 customers and tuned more than 500 vehicles a week. According to internal PPEI records, PPEI typically sold well over a million dollars of product a month. According to sales statistics WILLIS and PPEI reported to the EPA, between 2013 and 2018, among other products, PPEI sold 59,135 delete tunes, or tuners with delete tunes. According to EPA calculations of the estimated emissions impact, those self-reported PPEI delete tune sales are anticipated to cause over 100 million excess pounds of NOx (just one of many pollutants increased by deletion) over the life of the diesel trucks equipped with those products. These calculations are based on full deletions - as indicated above, partial deletions (short of a full delete) may yield lesser emissions increases. PPEI also reported to EPA that it sold 6,703 units of EGR delete hardware and exhaust aftermarket delete hardware during that same 2013 to 2018 time frame.

12

13

EPA's Air Enforcement Division issued a Notice of Violation to PPEI in December 2016. PPEI's sales of delete tunes and other products continued and even increased thereafter.

14

15

16

17

18

19

20

21

Count Two represents an example of one sale transaction that occurred in part in the state and Eastern District of California. With respect to Count Two, on or about June 6, 2019, COMPANY A sold an EGR delete kit produced by COMPANY A to INDIVIDUAL A, located in Wisconsin, bundled with a delete tune produced by PPEI and the tuning platform produced by COMPANY B. COMPANY A charged INDIVIDUAL A $1,499.00 for the tune and the tuning platform. On or about June 7, 2019, PPEI billed COMPANY A $999.99 for the tune and the tuning platform. At the request of COMPANY A, PPEI shipped the tune and tuner to INDIVIDUAL A on or about July 10, 2019. A record check revealed the customer has a Ford 6.7L Powerstroke with a VIN ending in 3144. On June 26, 2019, COMPANY B sent WILLIS an automated email reflecting that a vehicle associated with that customer's first name and the vehicle's VIN had been associated with PPEI. The notes associated with that transaction stated: "Full delete kit and wicked wheel." WILLIS forwarded the email to several PPEI employees, including PPEI EMPLOYEE A and PPEI EMPLOYEE C.

22

23

24

*As the authorized representative of defendant PPEI, I have carefully read and reviewed the entire factual basis in Exhibit A above and discussed it with PPEI's attorneys. I hereby stipulate that this factual basis is true and accurate to the best of my knowledge and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt. As far as PPEI's conduct is concerned, I adopt it as PPEI's own true statement.*

25

26

27

28

Dated:

3/16/2022

POWER PERFORMANCE ENTERPRISES, INC.
By president and authorized representative
KORY B. WILLIS
Defendant

PLEA AGREEMENT

A-8

EXHIBIT B

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. _____** |
| **v.** ) | |
| ) | |
| **POWER PERFORMANCE** ) | |
| **ENTERPRISES, INC. and** ) | |
| **KORY BLAINE WILLIS,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**<u>CONSENT DECREE</u>**

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE .................................................................................... 2
II.     APPLICABILITY ........................................................................................................ 3
III.    DEFINITIONS.............................................................................................................. 4
IV.     CIVIL PENALTIES..................................................................................................... 8
V.      COMPLIANCE REQUIREMENTS........................................................................... 11
VI.     CONDITIONALLY EXEMPT PRODUCTS .............................................................. 15
VII.    REPORTING REQUIREMENTS .............................................................................. 16
VIII.   STIPULATED PENALTIES ...................................................................................... 19
IX.     FORCE MAJEURE .................................................................................................... 23
X.      DISPUTE RESOLUTION .......................................................................................... 25
XI.     INFORMATION COLLECTION AND RETENTION ............................................... 27
XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS .................................... 29
XIII.   COSTS ....................................................................................................................... 30
XIV.    NOTICES ................................................................................................................... 30
XV.     EFFECTIVE DATE .................................................................................................... 32
XVI.    RETENTION OF JURISDICTION ............................................................................ 32
XVII.   MODIFICATION ....................................................................................................... 32
XVIII.  TERMINATION ......................................................................................................... 32
XIX.    PUBLIC PARTICIPATION ....................................................................................... 33
XX.     SIGNATORIES/SERVICE ........................................................................................ 33
XXI.    INTEGRATION ......................................................................................................... 34
XXII.   FINAL JUDGMENT .................................................................................................. 34
XXIII.  26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION........................................ 34
XXIV.   APPENDICES ............................................................................................................ 35

WHEREAS, Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a Complaint in this action concurrently with this Consent Decree, alleging that Power Performance Enterprises, Inc. ("PPEI") and Kory B. Willis violated Section 203 of the Clean Air Act ("Act"), as amended, 42 U.S.C. § 7522, by manufacturing, selling, offering for sale, or installing certain motor vehicle parts or components, the principal effect of which is to bypass, defeat, or render inoperative a motor vehicle emission-control device or element of design;

WHEREAS, Section 203(a)(3)(A) of the Act, 42 U.S.C. § 7522(a)(3)(A), prohibits any person from knowingly removing or rendering inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under Title II of the Act after sale and delivery to the ultimate purchaser;

WHEREAS, Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B), prohibits any person from manufacturing, selling, offering for sale, or installing, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under Title II of the Act, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use;

WHEREAS, the Complaint alleges that Mr. Willis and PPEI manufactured, sold, or installed numerous subject aftermarket performance products, the effect of which is to bypass, defeat, or render inoperative a device or element of design installed on or in motor vehicles or motor vehicle engines to control the emission of pollutants;

WHEREAS, the United States' Complaint seeks injunctive relief and the assessment of

1

civil penalties;

WHEREAS, both Mr. Willis and PPEI deny any liability to the United States arising out of the conduct, transactions, or occurrences alleged in the Complaint and Consent Decree;

WHEREAS, on September 13, 2019, Mr. Willis and PPEI represented to the United States that, as of 2:00 PM Central Time on September 16, 2019, PPEI's website would halt sales of products that remove or bypass the EGR system, aftermarket race exhaust systems that remove after-treatment systems, and tuning products that disable or allow removal of Stock emissions control systems;

WHEREAS, the United States has reviewed Financial Information regarding the Defendants' ability to pay a civil penalty in this matter and, based on that information, has determined that the Defendants have a limited ability to pay a civil penalty in this matter; and

WHEREAS, the United States, Mr. Willis and PPEI (collectively, the "Parties") recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the parties, it is hereby ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.    The Court has jurisdiction over the subject matter of this action and the Parties pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and Sections 204 and 205 of the Act, 42 U.S.C. §§ 7523 and 7524.

2.      Venue in this Court is proper pursuant to Sections 204 and 205 of the Act, 42 U.S.C. §§ 7523 and 7524, and 28 U.S.C. §§ 1391(b) and 1395(a).  For purposes of this Consent Decree, or any action to enforce this Decree, Mr. Willis and PPEI consent to the Court's jurisdiction over this Decree or such action and over Mr. Willis and PPEI, and consent to venue in this judicial district.  For purposes of this Consent Decree, Mr. Willis and PPEI agree that the Complaint states claims upon which relief may be granted pursuant to Sections 203, 204, and 205 of the Act, 42 U.S.C. §§ 7522, 7523, and 7524.

II.      APPLICABILITY

3.      The obligations of this Consent Decree are binding upon the United States, and apply to and are binding upon Defendants, jointly and severally, and on any successors, assigns or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation of any of Defendants' businesses, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of their obligation to ensure that the terms of the Decree are implemented unless (a) the transferee agrees to undertake the obligations required by this Decree and to be substituted for one or both of the Defendants as a Party under the Decree and thus be bound by the terms thereof, (b) the United States consents to relieve Defendants of its/their obligations, and (c) the Court approves the substitution.  The United States may refuse to approve the substitution of the transferee for one or both Defendants if it determines that the proposed transferee does not have the financial or technical ability to comply with the requirements of the Decree.  At least 30 Days prior to any transfer of ownership or operation of any Defendants' businesses that are engaged in manufacturing, selling, offering to sell, distributing or installing any Subject Product, PPEI or Mr. Willis shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the

proposed written agreement, to EPA and to the United States in accordance with Section XIV (Notices). Any attempt to transfer ownership or operation of any of Defendants' businesses that are engaged in manufacturing, selling, offering to sell, distributing or installing any Subject Product, without complying with this Paragraph, constitutes a violation of this Decree.

5. Within 30 Days of the Effective Date, Defendants shall provide a copy of this Consent Decree (including all Appendices) to all officers, directors, employees and agents of the Defendants whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III.    DEFINITIONS

7. Terms used in this Consent Decree that are defined in the Act or in regulations promulgated in accordance with the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.    "Act" means the Clean Air Act, as amended, 42 U.S.C. § 7401 *et seq*.

b.    "Authorized Dealer" means any third-party authorized by Defendants to sell products, including any wholesale distributor.

c.    "CARB Executive Order" or "CARB EO" means an official exemption issued by the California Air Resources Board ("CARB") exempting an aftermarket product from the prohibitions of Section 27156 of the California Vehicle Code.

d.    "Complaint" means the complaint filed by the United States in this action.

e.    "Complete Application" means an application for a CARB Executive Order that has been submitted to CARB and contains all forms and information, including the results of emissions testing, required by CARB at the time the application is submitted.

f.    "Conditionally Exempt Product" means any Product for which Defendants have satisfied all of the requirements set forth in Section VI.

g.    "Configuration" means any unique combination of motor vehicle, motor vehicle engine, vehicle or engine systems, vehicle or engine parameters, and Products.

h.    "Consent Decree" or "Decree" means this Decree and all appendices attached hereto and identified in Section XXIV.

i.    "Day" means a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

j.    "Defendants" means Power Performance Enterprises, Inc. ("PPEI"), a Louisiana corporation with its current principal place of business at 6096 Candice Lane, Lake Charles, LA 70615, and Kory B. Willis, an individual and owner and president of PPEI.

k.    "Diesel Oxidation Catalyst System" or "DOC" means any oxidation catalyst used to reduce emissions from diesel-fueled vehicles and equipment, including all hardware, components, parts, sensors, subassemblies, software, firmware, auxiliary emission control devices ("AECDs"), and calibrations that collectively constitute the system for implementing this strategy.

l.    "Diesel Particulate Filter System" or "DPF" means all hardware, components, parts, sensors, subassemblies, software, firmware, AECDs, calibrations, and other Emissions-Related Elements of Design that collectively constitute the system for controlling emissions of particulate matter by trapping such particulates in a filter and periodically oxidizing them through thermal regeneration of the filter.

m.    "Effective Date" shall have the definition provided in Section XV.

n.    "Emissions-Related Elements of Design" means any part, device or element of design installed on or in a motor vehicle or motor vehicle engine by an OEM for the specific purpose of controlling emissions or which must function properly to assure continued vehicle emission compliance, including but not limited to:

    i.    OBDs;

    ii.    Diagnostic Trouble Codes;

    iii.    Oxygen sensors;

5

iv.  NOx sensors;

v.  Ammonia sensors;

vi.  PM sensors;

vii.  Urea quality sensors;

viii.  Exhaust gas temperature sensors;

ix.  DPF differential pressure sensors;

x.  EGRs;

xi.  DOCs;

xii.  SCRs;

xiii.  DPFs;

xiv.  NACs;

xv.  Engine calibrations that affect engine combustion (e.g., fuel injection timing, multiple injection patterns, fuel injection mass for each injection event, fuel injection pressure, boost pressure, EGR flowrate, mass air flowrate, EGR cooler bypassing); and

xvi.  All other parts, devices or elements of design installed in compliance with Title II of the Act and its regulations.

o.  "EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

p.  "Exhaust Gas Recirculation System" or "EGR" means all hardware, components, parts, sensors, subassemblies, software, firmware, AECDs, and calibrations that collectively constitute the system for controlling NOx emissions by recirculating a portion of engine exhaust gas into the cylinders of an engine.

q.  "Financial Information" means the documentation identified in Appendix D, which was submitted to the United States by the Defendants.

r.  "Identified Subject Products" means the Products identified in Appendix A.

s.  "Marketing Materials" means all materials or communications containing or conveying information that is generated or controlled by the Defendants to discuss, describe, or explain any of Defendants' products, in any form, including but not limited to electronic and hardcopy information used in advertisements, training materials, online videos (e.g., YouTube), social media webpages (e.g., Facebook, Instagram) and user manuals or guides.

6

t.      "Motor Vehicle" has the meaning provided in 42 U.S.C. § 7550(2) and 40 C.F.R. § 85.1703.

u.      "NOx Adsorber Catalyst System" or "NAC" means the strategy for controlling NOx emissions from partial lean burn gasoline engines and from diesel engines by adsorbing the NOx emissions onto a catalyst substrate during lean combustion followed by periodic regeneration of the substrate during short, richer-than-stoichiometric combustion, together with all hardware, components, parts, sensors, subassemblies, software, firmware, AECDs, and calibrations that collectively constitute the system for implementing this control strategy.

v.      "On-Board Diagnostics System" or "OBD" means the strategy for monitoring the functions and performance of the emission control system and all other systems and components that must be monitored under 13 Cal. Code. Regs. §§ 1968.1 and 1968.2, for identifying and detecting malfunctions of such monitored systems and components, and for alerting the driver of such potential malfunctions by illuminating the malfunction indicator light ("MIL"), together with all hardware, components, parts, sensors, subassemblies, software, firmware, AECDs, and calibrations that collectively constitute the system for implementing this strategy.

w.      "Original Equipment Manufacturer" or "OEM" means the manufacturer responsible for the design and production of a motor vehicle or motor vehicle engine.

x.      "Other Subject Products" means any motor vehicle Product: (i) a principal effect of which is to bypass, defeat, or render inoperative a motor vehicle emission control device or Emissions-Related Element of Design; (ii) that enables an Emissions-Related Element of Design to be removed, disabled or bypassed, (iii) that interferes with the function of, or allows the removal of, one or more Emissions-Related Elements of Design; (iv) that modifies one or more Emissions-Related Elements of Design; or (v) that is materially similar to any of the Identified Subject Products.

y.      "PPEI" means Power Performance Enterprises, Inc., a Louisiana corporation with its current principle place of business at 6096 Candice Lane, Lake Charles, LA 70615.

z.      "Paragraph" means a portion of this Decree identified by an Arabic numeral.

aa.     "Parties" means the United States and the Defendants.

bb.     "Permanently Delete and/or Destroy" means (a) in the case of hardware, to crush the device and all of its parts or components to render them useless; and (b) in the case of software, firmware, tunes, calibrations or other programming, to completely and permanently erase all programming and information.

cc.     "Product" means any motor vehicle or engine part or component including, but not limited to, hardware, software, firmware, tunes, calibrations or other

7

programming (and devices on which such software, firmware, tunes, calibrations or other programming are loaded).  Products include Subject Products (i.e., Identified Subject Products and Other Subject Products) and Conditionally Exempt Products.

dd. "Section" means a portion of this Decree identified by a Roman numeral.

ee. "Selective Catalytic Reduction System" or "SCR" means all hardware, components, parts, sensors, sub-assemblies, software, firmware, AECDs, calibrations, and other elements of design that collectively constitute the system for controlling $NO_x$ emissions through catalytic reduction using an ammonia-based diesel exhaust fluid ("DEF") as the reducing agent, including without limitation all hardware, components, parts, sensors, subassemblies, software, firmware, AECDs, calibrations, and other Elements of Design relating to (1) the DEF storage tank; (2) the DEF injectors, (3) the dosing control unit, and (4) the SCR catalysts assembly.

ff. "Subject Product(s)" means, collectively, all "Identified Subject Product(s)" and all "Other Subject Product(s)".  Conditionally Exempt Products are not Subject Products.

gg. "Technical Support" means a range of services offered by Defendants to customers or dealers involving the provision of assistance or advice on the use, installation, or repair of products.  Technical Support includes, but is not limited to, software or firmware updates, upgrades, or patches; communications in or concerning product owners' and users' manuals; and answers to specific questions provided by phone, on-line, or in person.

hh. "United States" means the United States of America, acting on behalf of EPA.

## IV.   CIVIL PENALTIES

8. Defendants shall pay the sum of $1,550,000 as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 ("Interest"), as of the date of lodging.  Defendants are jointly and severally liable for the civil penalties due.  This payment shall be made in three consecutive annual payments, with the first payment in the amount of $516,667.00 due 30 Days after the Effective Date, the second payment in the amount of $516,667.00 due one year after the Effective Date, and the third payment in the amount of $516,666.00 due two years after the Effective Date.  Defendants shall include with each installment payment an additional amount

for Interest on the total unpaid penalty amount from the Date of Lodging through the date of payment.

9.     The United States' agreement to the amount of the civil penalty required by Paragraph 8 is based on the Financial Information.  Defendants hereby certify that the Financial Information is true, accurate, and complete and that there has been no material improvement in the Defendants' financial condition between the time the Financial Information was submitted and the date of the Defendants' execution of this Consent Decree.  Notwithstanding any other provision of this Consent Decree, the United States reserves the right to reinstitute or reopen this action, or to commence a new action seeking relief other than as provided in this Consent Decree, if the Defendants' Financial Information is false, or in any material respect, inaccurate or incomplete.  This right is in addition to any other rights and causes of action, civil or criminal, that the United States may have under law or equity in such event.

10.     Defendants shall pay the civil penalties due by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants, following entry of the Consent Decree, by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Western District of Louisiana.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions to:

Kory Willis, President
Power Performance Enterprises, Inc.
6096 Candice Lane
Lake Charles, LA  70615

on behalf of Defendants.  Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States and EPA in accordance with Section XIV (Notices).

11.    At the time of each payment, Defendants shall send notice that the payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to the United States via email or regular mail in accordance with Section XIV (Notices); and (iii) to EPA in accordance with Section XIV.  Such notice shall state that the payment is for the civil penalties owed pursuant to the Consent Decree in *United States v. Power Performance Enterprises, Inc. and Kory B. Willis*, and shall reference the civil action number, CDCS Number, and DOJ case number 90-5-2-1-11865.

12.    Defendants shall not deduct any penalties paid under this Decree in accordance with this Section or Section VIII (Stipulated Penalties) in calculating federal income tax.

13.    <u>Acceleration of Payments</u>.

a.    Defendants shall have the option (at their sole discretion) to pay any of the amounts required by Paragraph 8 above before they are due.  Prior to making any such pre-payment, Defendants shall contact the FLU for a determination regarding the amount of Interest to be included with the payment.

b.    If the Defendant fails to pay any payment required by Paragraph 8 above by the required due date, all remaining payments and all accrued Interest shall become due immediately upon such failure.  Interest shall continue to accrue on any unpaid amounts until the total amount due has been received.  Interest required by this Paragraph shall be in addition to any stipulated penalties owed pursuant to Paragraph 40.

c.      In the event of any sale, assignment, transfer, or other disposition (including by consolidation, merger, or reorganization) of all or substantially all of the assets of PPEI or of a controlling interest in PPEI, unless the United States has agreed in writing that Defendants' payment obligations under Paragraph 8 shall be assumed in such transaction, all remaining payments and all accrued Interest shall be due immediately.  Interest will continue to accrue on any unpaid amounts until Defendants pay the total amount due.  Interest required under this Paragraph is in addition to any stipulated penalties owed under Paragraph 40.

d.      If the Defendant becomes a debtor in a case filed under Title 11 of the United States Code, 11 U.S.C. 101 et seq., all remaining payments and all accrued Interest shall be due immediately.  Interest will continue to accrue on any unpaid amounts until Defendants pay the total amount due.  Interest required under this Paragraph is in addition to any stipulated penalties owed under Paragraph 40.

## V.      COMPLIANCE REQUIREMENTS

14.      <u>Prohibitions Pertaining to Subject Products</u>.  Defendants shall not manufacture, sell, offer to sell, or install any Subject Product either directly or through any other business owned by, operated by, or affiliated, in whole or in part, with Mr. Willis or PPEI.  Any Product for which Defendants have satisfied the requirements set forth in Section VI to be a Conditionally Exempt Product is not a Subject Product.

15.      <u>Destruction of All Subject Products</u>.  No later than 30 Days after the Effective Date, Defendants shall Permanently Delete and/or Destroy all Subject Products in their possession and control, including those Subject Products available through any proprietary or cloud system.  No later than 60 Days after the Effective Date, Defendants shall Permanently Delete and/or Destroy all Subject Products forfeited by employees and officers of Defendants pursuant to Paragraph 23.  Defendants shall provide to EPA information about all Subject

11

Products deleted or destroyed pursuant to this Paragraph consistent with the requirements in Section VII.

16.    <u>Prohibition on Technical Support for All Subject Products</u>.  Defendants shall not offer or make available any Technical Support or other information (including Marketing Materials) pertaining to the installation, manufacture, sale, use, or repair of any Subject Product. Defendants shall deny all warranty claims pertaining to any Subject Product.

17.    <u>Instructions to Authorized Dealers</u>.  No later than 30 Days after the Effective Date, Defendants shall (a) notify all Authorized Dealers that Defendants are no longer honoring warranty claims pertaining to any Subject Product and that Defendants are no longer supplying Technical Support pertaining to the installation, manufacture, sale, use or repair of any Subject Product; and (b) instruct all Authorized Dealers to refuse to honor any warranty claims pertaining to any Subject Product and to refuse to supply any Technical Support or other information (including Marketing Materials) pertaining to the installation, manufacture, sale, use, or repair of any Subject Product.

18.    Notwithstanding the requirements of Paragraphs 16 and 17, Defendants and any Authorized Dealers may assist customers in removing any Subject Products from vehicles on which they were installed and returning such vehicles to the OEM settings.  Defendants and any Authorized Dealers may provide Technical Support to customers that does not involve the installation, manufacture, sale, use or repair of Subject Products.

19.    <u>Prohibition on Transfer of Intellectual Property</u>.  Defendants shall not offer for sale, sell, convey, or otherwise transfer in any way the design, source code, technology, manufacturing process, or other intellectual property associated with any Subject Product, except

as part of a submission to CARB or in response to a request from EPA, DOJ or another federal law enforcement office.

      20.    <u>Revision of Marketing Materials</u>.  No later than 30 Days after the Effective Date, Defendants shall revise all Marketing Materials for Subject Products to ensure that such materials do not include any information, including but not limited to instructions or demonstrations, that pertains or relates in any way to deleting, bypassing, defeating, or rendering inoperative any emission control device or Emissions-Related Element of Design.

      21.    <u>Notice to all Identified Authorized Dealers and Subject Product Customers</u>.  No later than 30 Days after the Effective Date, Defendants shall transmit a notice by U.S. Mail or e-mail that includes the language specified in Appendix B to (a) each Authorized Dealer and (b) each end-use customer to which the Defendants sold an Identified Subject Product on or after September 1, 2013.

      22.    <u>Notice to Employees</u>.  No later than 30 Days after the Effective Date, Defendants shall post a written notice of applicable Clean Air Act prohibitions, incorporating language contained in Appendix C to this Decree, in conspicuous locations, both physical and electronic, where Defendants' officers and employees will regularly encounter it.  These postings must include both hardcopy postings in a physical location and on-line, electronic postings.

      23.    <u>Forfeiture of Subject Products Controlled by Defendants' Officer and Employees</u>. No later than 30 Days after the Effective Date, Defendants shall offer to buy back at fair market value all Subject Products in the possession of each officer and employee of the Defendants and all Subject Products installed on any motor vehicle owned or operated by such officers and employees, or under his or her control.  Defendants shall request that all such Subject Products

are timely forfeited to an individual designated by Defendants and identified to EPA for such purpose.

24.    <u>Training of Employees</u>.  No later than 30 Days after the Effective Date, and continuing on an annual basis thereafter, Defendants shall conduct a Clean Air Act Compliance Training Program for all officers, employees, contractors and consultants (hereinafter, "trainees").  The Training Program shall:

    a.    Include detailed information regarding:

        i.    The Compliance Requirements set forth in Section V of this Consent Decree;

        ii.    The acts prohibited by Section 203(a)(3) of the Act, 42 U.S.C. § 7522(a)(3), including the statutory language of Section 203(a)(3);

        iii.    The categories of potentially liable persons under the Act, including individuals;

        iv.    The relevant maximum civil penalties for each violation of Section 203(a)(3)(A) and 203(a)(3)(B), as adjusted for inflation in 40 C.F.R. Part 19; and

        v.    The acts prohibited by Section 113(c)(2) of the Act, 42 U.S.C. § 7413(c)(2), including the statutory language of that Section and the criminal penalties set forth therein.

    b.    Be conducted in person or, for trainees who work remotely or have health conditions that foreclose in-person attendance, by video;

    c.    Provide the trainees with a written summary of all training content, including the information required in Paragraph 24(a); and

    d.    Require all trainees to acknowledge, in writing, that they participated in the training session and received a written summary of all content as required by this Paragraph 24(c).

25.    <u>Prohibition on Tampering</u>.  Defendants shall not remove or render inoperative any device or Emissions-Related Element of Design installed on or in a motor vehicle or motor vehicle engine in compliance with the Act.

VI.    CONDITIONALLY EXEMPT PRODUCTS

26.    For purposes of this Consent Decree only, and subject to Paragraphs 27 through 30, a Product is a Conditionally Exempt Product if it satisfies the requirements set forth in (a) or (b) of this Paragraph:

    a.    A CARB EO has been issued for the Product; or

    b.    Defendants have submitted to CARB a Complete Application for a CARB EO that covers and applies to the Product.

27.    Notwithstanding any other provision of this Consent Decree, a Product shall cease to be a Conditionally Exempt Product if:

    a.    CARB denies, or Defendants withdraw, the Complete Application for a CARB EO that pertains to the Product.  For the purposes of this sub-Paragraph, "denies" shall mean any communication from CARB indicating that the application is not or will not be approved.

    b.    The Complete Application that pertains to the Product is still pending two or more years after its initial submission.  EPA may, in its unreviewable discretion, extend this two-year timeframe upon the written request of the Defendants; or

    c.    The Complete Application that pertains to the Product is invalidated or revoked for any reason.

28.    Notwithstanding any other provision of this Consent Decree, a Product is not a Conditionally Exempt Product if:

    a.    Any documentation or information provided to CARB or to EPA related to the Product is materially incorrect or inaccurate;

    b.    The Product is marketed using identification other than that shown in the associated Complete Application or CARB EO;

    c.    The Product is marketed for a configuration other than that listed in the associated Complete Application or CARB EO.

29.    If a Subject Product ceases to be Conditionally Exempt for any reason, Defendants shall (i) immediately cease manufacturing, selling, and installing that Product; (ii) remove that Product from Defendants' website(s); (iii) notify all Authorized Dealers, in writing,

that continued sale of that Product violates the Act; and (iv) take other reasonable efforts to remove that Product from commerce.

30.    <u>Product Labeling</u>.  Defendants shall label each Conditionally Exempt Product with a permanent label or other marker that contains the Product manufacturer's name, the Product name and a unique identifier. Defendants shall situate the label or other marking such that it remains visible or readily accessible after the Product is installed.  For Conditionally Exempt Products that are only available as downloadable software, Defendants shall maintain a publicly accessible webpage that includes, for each such Product, the Product manufacturer's name, the Product name, a unique identifier, an EO number if applicable, and the status of any EO application.

31.    <u>Not a Compliance Determination</u>.  Defendants shall not state or imply in any way or in any forum that, as a result of compliance with any aspect of this Consent Decree, any Product is covered by a compliance determination (or similar designation) from EPA.  For the avoidance of doubt, Defendants may provide prospective purchasers information related to the CARB Executive Orders it has applied for or obtains in relation to any Products.

## VII.    REPORTING REQUIREMENTS

32.    By January 31st and July 31st of each year after the Effective Date, and continuing on a semi-annual basis until termination of this Decree, and in addition to any other express reporting requirements of this Decree, Defendants shall submit a semi-annual progress report for the preceding six months, covering January 1 through June 30 or July 1 through December 31, as applicable.  The semi-annual progress report shall include, but is not limited to, the following:

a.    A statement regarding the status of the payment of (i) the civil penalties and associated Interest pursuant to Paragraph 8 and (ii) any stipulated penalties owing pursuant to Section VIII;

b.    A complete copy of all information submitted to CARB as part of an application

for a CARB EO during the reporting period, including the date of the initial submission, all emission test data and any CARB EO application changes, denials, or withdrawals;

c.    A complete copy of any CARB EO obtained during the reporting period;

d.    A list of all Products that Defendants believe qualify as Conditionally Exempt Products and a basis therefor;

e.    As to Subject Products that were deleted or destroyed pursuant to Paragraph 15, a list of all hardware products, including product names, type, serial numbers, and date of destruction; and a list of all software, data, or other information that was destroyed or deleted, including the type of software, data or other information and the date of destruction or deletion;

f.    A list of all Authorized Dealers to whom Defendants provided instructions pursuant to Paragraph 17 and a copy of any such instructions provided;

g.    A list of all Authorized Dealers and end-use customers to whom Defendants provided a notification pursuant to Paragraph 21 and a copy of any such notification provided;

h.    A copy of the written notice required to be posted pursuant to Paragraph 22 and a description of the manner and location of posting;

i.    A list of all products forfeited in accordance with Paragraph 23, the name of the individual to whom the products were delivered for forfeiture, and documentation of the destruction or deletion of such products as set forth in Paragraph 15;

j.    A list of all officers, employees, contractors and consultants who participated in the Clean Air Act Compliance Training Program during the reporting period, pursuant to Paragraph 24 and a copies of the training acknowledgments signed by the participants; and

k.    A description of any noncompliance with the requirements of this Consent Decree, including an explanation of the violation's likely cause and of the specific remedial steps taken, or to be taken, to resolve and/or minimize such violation, and the specific steps to be taken to prevent such further violations.

33.    If Defendants violate, or have reason to believe that either Defendant may violate, any requirement of this Consent Decree, Defendants shall notify the United States of such violation and its likely duration, in writing, within 10 business Days of the Day Defendants first became aware of the violation, with an explanation of the violation's likely cause and of the specific remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause

of a violation cannot be fully explained at the time the report is due, Defendants shall so state in the report along with the reason(s) why the violation cannot be fully explained.  Defendants shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendants became aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves Defendants of the obligation to provide the notice required by Section IX (Force Majeure).

34.    Whenever any violation of this Consent Decree or any other event affecting Defendants' performance under this Decree may pose an immediate threat to public health or welfare or to the environment, Defendants shall notify EPA orally or by electronic means as soon as possible, but no later than 24 hours after Defendants first knew of the violation or event.  This procedure is in addition to the requirements set forth in the preceding Paragraph.

35.    All reports shall be submitted to the persons designated in Section XIV (Notices) and shall include the civil action number of this case and the DOJ case number, 90-5-2-1-11865.

36.    Each report submitted by Defendants under this Section shall be signed by an official of Defendant PPEI and by Defendant Kory Willis individually, and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true, accurate, and complete.  I am aware that there are significant penalties for intentionally submitting false information, including the possibility of fine and imprisonment for knowing violations.

37.     This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

38.     The reporting requirements of this Consent Decree do not relieve Defendants of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

39.     Any information provided in accordance with this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VIII.   STIPULATED PENALTIES

40.     Defendants shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in the table below, unless excused under Section IX (Force Majeure), or reduced or waived by the United States pursuant to Paragraph 47.  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

| Consent Decree Violation | Stipulated Penalty |
| --- | --- |
| Manufacture, sell, offer to sell, or install any Subject Product, in violation of the requirements of Paragraph 14 (Prohibitions pertaining to Subject Products) | For the first 100 Subject Products, $2,500 per unit of Subject Product manufactured, sold, or installed, or two times the gross amount received for each unit, whichever is greater.  For each Subject Product thereafter, $4,500 per unit of Subject Product manufactured, sold, or installed, or two times the gross amount received for each unit, whichever is greater. |

| | |
|---|---|
| Failure to comply with any requirement of Paragraph 15 (Destruction of all Subject Products) | $500 per Day for the first 15 Days of noncompliance; $1,000 per Day for the 16th through 30th Days of noncompliance; and $2,000 per Day thereafter. |
| Failure to comply with the requirements of Paragraph 16 (Prohibition on Technical Support for all Subject Products) | $2,500 per violation. |
| Failure to comply with the requirements of Paragraph 17 (Instruction to Authorized Dealers) | $350 per Day for the first 15 Days of noncompliance; $1,000 per Day for the 16th through 30th Days of noncompliance; and $2,500 per Day thereafter. |
| Failure to comply with the requirements of Paragraph 19 (Prohibition on transfer of Intellectual Property) | $50,000 per transfer or two times the gross amount received from the transfer, whichever is greater. |
| Failure to comply with the requirements of Paragraph 20 (Revision of Marketing Materials) | $350 per Day for the first 15 Days of noncompliance; $1,000 per Day for the 16th through 30th Days of noncompliance; and $2,500 per Day thereafter. |
| Failure to comply with the requirements of Paragraph 21 (Notice to all Identified Subject Product customers) | $2,000 per customer or Dealer. |
| Failure to comply with the requirements of Paragraph 22 (Notice to employees) | $350 per Day for the first 30 Days of noncompliance; $2,000 per Day thereafter. |
| Failure to comply with the requirements of Paragraph 23 (Forfeiture of Subject Products Controlled by Officers and Employees) | $350 per Day for the first 30 Days of noncompliance; and $4,000 per Day thereafter. |
| Failure to comply with the requirements of Paragraph 24 (Training of employees) | $500 per employee not trained. |

| Manufacture, sell, offer to sell, or install any Product, on the basis that it is a Conditionally Exempt Product, in violation of any of the requirements in Paragraphs 27 through 30. | For the first 100 Products, $2,500 per unit of Product manufactured, sold, or installed, or two times the gross amount received for each unit, whichever is greater. For each Product thereafter, $4,500 per unit of Product manufactured, sold, or installed, or two times the gross amount received for each unit, whichever is greater. |
|---|---|
| Violation of any other requirement of this Consent Decree | $350 per day for the first 30 Days of noncompliance and $2,500 per Day thereafter. |

41.    <u>Periodic Reports</u>.  If Defendants fail to submit a Semi-Annual Report, or fail to submit a complete Semi-Annual Report, as required by Paragraph 32, Defendants shall pay a stipulated penalty of $1,000 per Day for the first 30 Days of noncompliance and $2,500 per Day thereafter.

42.    <u>Late Payment of Civil Penalty</u>.  If Defendants fail to pay the civil penalties required to be paid under Section IV (Civil Penalties) when due, Defendants shall pay a stipulated penalty of $1,000 per Day for each Day that the payment is late.

43.    Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

44.    Defendants shall pay stipulated penalties to the United States within 30 Days of a written demand by the United States, unless Defendants invoke the dispute resolution procedures under Section X (Dispute Resolution) within the 30-Day period.

45.    Stipulated penalties shall continue to accrue as provided in Paragraph 43 during any Dispute Resolution, but need not be paid until the following:

a.      If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

b.      If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within 30 Days of receiving the Court's decision or order, except as provided in Paragraph 45(c), below.

c.      If any Party appeals the District Court's decision, Defendants shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

46.     If a Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, the Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph limits the United States from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties or interest.

47.     The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

48.     Defendants shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 10, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

49.     The payment of stipulated penalties and/or interest pursuant to this Section shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

50.     Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XII (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any

other rights, remedies, or sanctions available to the United States for Defendants' violation of

this Decree or applicable law.  Where a violation of this Decree is also a violation of relevant

statutory or regulatory requirements, Defendants shall be allowed a credit, for any stipulated

penalties paid, against any statutory penalties imposed for such violation under the applicable

federal requirement.

IX.     FORCE MAJEURE

51.     "Force majeure," for purposes of this Consent Decree, is defined as any event

arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or

of Defendants' contractors, which delays or prevents the performance of any obligation under

this Consent Decree despite Defendants' best efforts to fulfill the obligation.  The requirement

that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to

anticipate any potential force majeure event and best efforts to address the effects of any

potential force majeure event (a) as it is occurring and (b) following the potential force majeure,

such that the delay and any adverse effects of the delay are minimized.  "Force majeure" does

not include Defendants' financial inability to perform any obligation under this Consent Decree.

52.     If any event occurs or has occurred that may delay the performance of any

obligation under this Consent Decree, whether or not caused by a force majeure event,

Defendants shall provide notice by electronic transmission to EPA, within 72 hours of when

Defendants first knew that the event might cause a delay to the addresses provided in Section

XIV (Notices).  Within seven Days thereafter, Defendants shall provide in writing to EPA an

explanation and description of the reasons for the delay; the anticipated duration of the delay; all

actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of

any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants'

rationale for attributing such delay to a force majeure event if it intends to assert such a claim;

23

and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

53.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

54.    If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendants in writing of its decision.

55.    If a Defendant elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so no later than 15 Days after receipt of EPA's notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and

24

that Defendants complied with the requirements of Paragraphs 51 and 52.  If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to EPA and the Court.

X.    DISPUTE RESOLUTION

56.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendants arising under this Decree.

57.    Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 10 Days after the conclusion of the informal negotiation period, Defendants invoke formal dispute resolution procedures as set forth below.

58.    Formal Dispute Resolution.  Defendants shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

25

59.     The United States shall serve its Statement of Position within 45 Days of receipt of Defendants' Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

60.     Defendants may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIV (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within 10 Days of receipt of the United States' Statement of Position under the preceding Paragraph.  The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

61.     The United States shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court.  Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

62.     <u>Standard of Review</u>.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 58, Defendants shall bear the burden of demonstrating that their position complies with this Consent Decree, and that Defendants are entitled to relief under applicable principles of law.  The United States reserves the right to argue that its position is reviewable only on the administrative record and must be upheld unless arbitrary and capricious.

63.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 45.  If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

XI.     INFORMATION COLLECTION AND RETENTION

64.     The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any of Defendants' business facilities, at all reasonable times, upon presentation of credentials, to:

a.      Monitor the progress of activities required under this Consent Decree;

b.      Verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.      Inspect records and any product(s) regulated under Title II of the Act or the regulations promulgated thereunder;

d.      Obtain documentary evidence, including photographs, software, or other data or information; and

e.      Assess Defendants' compliance with this Consent Decree.

65.     Until two years after the termination of this Consent Decree, unless otherwise specified herein, Defendants shall retain, and shall instruct their contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of its obligations under this Consent Decree.  This information-retention requirement shall apply regardless of any contrary

27

corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

66.    At the conclusion of the information-retention period provided in the preceding Paragraph, Defendants shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Defendants shall deliver any such documents, records, or other information to EPA.  Defendants may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Defendants assert such a privilege, they shall provide the following:  (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendants.  However, no documents, records, or other information created or generated in accordance with the requirements of this Consent Decree shall be withheld on grounds of privilege.

67.    Defendants may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Defendants seek to protect as CBI, Defendants shall follow the procedures set forth in 40 C.F.R. Part 2.

68.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants

to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.    This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the date of lodging.

70.    The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree does not limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 69.  The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising as a result of Defendants' business or any of Defendants' products, whether related to the violations addressed in this Consent Decree or otherwise.

71.    In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief relating to the Defendants' operations, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved under Paragraph 69.

72.    This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits. The United States does not, by its consent to the entry of this Consent Decree,

29

warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, or with any other provisions of federal, State, or local laws, regulations, or permits.

73.     This Consent Decree does not limit or affect the rights of Defendants or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

74.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII.   COSTS

75.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalties or any stipulated penalties due but not paid by Defendants.

## XIV.   NOTICES

76.     Unless otherwise specified in this Decree, whenever notifications, submissions, statements of position, or communications are required by this Consent Decree (referred to as "notices" in this section), they shall be made electronically or as described below, unless such notices are unable to be uploaded to the CDX electronic system (in the case of EPA) or transmitted by email in the case of any other recipient.  For all notices to EPA, Defendants shall register for the CDX electronic system and upload such notices at https://cdx.gov/epa-home.asp. Any notice to EPA that cannot be uploaded or electronically transmitted via email shall be provided in writing to the address below:

As to the United States by email:    eescdcopy.enrd@usdoj.gov

Re: DJ # 90-5-2-1-11994


As to the United States by mail:    EES Case Management Unit

Environment and Natural Resources Division

U.S. Department of Justice

P.O. Box 7611

Washington, D.C.  20044-7611

Re: DJ # 90-5-2-1-11865


As to EPA:    Director, Air Enforcement Division

Office of Civil Enforcement

US EPA Headquarters, MC 2242A

1200 Pennsylvania Avenue, NW

Washington, DC  20460


As to Defendants:    Kory Willis, President

Power Performance Enterprises, Inc.

6096 Candice Lane

Lake Charles, LA  70615


77.    Any Party may, by written notice to the other Parties, change its designated notice recipients or notice addresses provided above.

78.    Notices submitted under this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV.    EFFECTIVE DATE

79.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI.    RETENTION OF JURISDICTION

80.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, under Sections X (Dispute Resolution) and XVII (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XVII.    MODIFICATION

81.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

82.    Any disputes concerning modification of this Decree shall be resolved under Section X (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 62, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII. TERMINATION

83.    After Defendants have: (a) completed the requirements of Paragraphs 15, 17, 20, 21, 22, 23 and 24; (b) complied with Paragraphs 14, 16, 19, and 25 for at least five years after the Effective Date; (c) paid the civil penalties required by Section IV, including any accrued Interest; and (d) paid any accrued stipulated penalties as required by this Consent Decree, Defendants

may serve upon the United States a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.

84.    Following receipt by the United States of Defendants' Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendants have satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

85.    If the United States does not agree that the Decree may be terminated, Defendants may invoke Dispute Resolution under Section X of this Decree.  However, Defendants shall not seek Dispute Resolution of any dispute regarding termination until 90 Days after service of its Request for Termination.

## XIX.   PUBLIC PARTICIPATION

86.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendants in writing that it no longer supports entry of the Decree.

## XX.   SIGNATORIES/SERVICE

87.    Each undersigned representative of the Defendants and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice

certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

88.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendants need not file an answer to the Complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXI.   INTEGRATION

89.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than the deliverables that are subsequently submitted pursuant to this Consent Decree, no other document, nor any representation, inducement, agreement, understandings, or promise constitutes any part of this Decree or the settlement it represents.

## XXII.  FINAL JUDGMENT

90.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendants.

## XXIII. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

91.    For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability), Paragraph 5; Section V (Compliance Requirements), Paragraphs 14 – 25; Section VI

(Conditionally Exempt Products), Paragraphs 26 – 30; Section VII (Reporting Requirements),
Paragraphs 32 – 36; and Section XI (Information Collection and Retention), Paragraphs 64 – 66,
is restitution or required to come into compliance with law.

XXIV. APPENDICES

92.    The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is a list of Identified Subject Products.

"Appendix B" is language to be included in the notice to customers referenced in
Paragraph 21.

"Appendix C" is language to be included in the notice to employees referenced in
Paragraph 22.

"Appendix D" is a general description of the Financial Information submitted by the
Defendants.

Dated and entered this _____ day of _____, 2022.


_____
UNITED STATES DISTRICT JUDGE

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Power Performance Enterprises Inc. and Kory B. Willis</u>, subject to public notice and comment:

FOR THE UNITED STATES OF AMERICA:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

**NICOLE VEILLEUX**  Digitally signed by
NICOLE VEILLEUX
Date: 2022.03.01
08:28:05 -05'00'

_____          _____
Date                            NICOLE VEILLEUX
                                Senior Counsel
                                Environmental Enforcement Section
                                Environment and Natural Resources Division
                                U.S. Department of Justice
                                Washington, DC  20044-7611
                                <u>Nicole.veilleux@usdoj.gov</u>
                                202-616-8746 (office)
                                202-532-3348 (cell)

BRANDON BONAPARTE BROWN
United States Attorney
Western District of Louisiana

JERRY EDWARDS (#30242)
Assistant United States Attorney
300 Fannin Street, Suite 3201
Shreveport, Louisiana 71101-3068
(318) 676-3614 // Fax: (318) 676-3642
Email: <u>jerry.edwards@usdoj.gov</u>

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Power Performance Enterprises Inc. and Kory B. Willis</u> subject to public notice and comment:

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

Date:_____

**LAWRENCE STARFIELD** Digitally signed by
LAWRENCE STARFIELD
Date: 2022.02.25
13:47:39 -05'00'

LAWRENCE E. STARFIELD
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, DC 20460

ROSEMARIE A. KELLEY
Director, Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, DC 20460

MARY E. GREENE
Director, Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, DC 20460

EDWARD KULSCHINSKY
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, DC 20460

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Power Performance Enterprises Inc. and Kory B. Willis:</u>

                                      FOR DEFENDANTS KORY B. WILLIS AND POWER
                                        PERFORMANCE ENTERPRISES, INC.:

2/10/22
Date:

Kory B. Willis
Individually and as Owner of Power Performance
Enterprises, Inc.
6096 Candice Lane
Lake Charles, LA  70615

38

# APPENDIX A:

# Identified Subject Products

## Appendix A:  Identified Subject Products

| Ref No. | Product Name | Item Code |
|---------|--------------|-----------|
| 1 | 2007.5 - 2016 Dodge Cummins EGR Bypass (non C&C only)  213000 | 213000 |
| 2 | 2010 - 2012  Sinister 6.7L Cummins EGR Delete | SD-EGRD-6.7C-10 |
| 3 | 2011 - 2014 6.7L FORD POWERSTROKE EGR BYPASS | No-Limit-Fab-67-EGRD-11-14 |
| 4 | 2011 - 2017 6.7L FORD POWERSTROKE EGR BYPASS | No-Limit-Fab-67-EGRD-17 |
| 5 | 2013- 2016 Cummins 3500 - 5500 EGR Bypass kit (C&C Only) 213020 | 213020 |
| 6 | 2015 - 2016 6.7L FORD POWERSTROKE EGR BYPASS | MPD-67-EGRD-15-16 |
| 7 | 2017 6.7L FORD POWERSTROKE EGR BYPASS | No-Limit-Fab-67-EGRD-17 |
| 8 | Chevrolet Cruze Diesel EGR Delete Kit | Chevrolet Cruze Diesel EGR Delete Kit |
| 9 | DRP LML EGR Bypass kit | DRP - 75120 |
| 10 | DRP LML EGR Delete Without Passenger side Up Pipe. | DRP - 75110 |
| 11 | DRP LML EGR Delete Without Passenger side Up Pipe | DRP - 75110 |
| 12 | Hardway Performance 2013+ 6.7 Cummins Compound Turbo Kit - Stage I | HWPS1 |
| 13 | LML EGR BYPASS KIT | SDP-1045 |
| 14 | LML EGR Delete | EGRD-WITH-UP-PIPE |
| 15 | LML Max Flow Bridge, Coldside Tube, Turbo Inlet, Cold Air Intake. | PPEI-Max-Flow-Piping |
| 16 | LML Max Flow Bridge, Hot Side, Coldside Tube, Turbo Inlet, Cold Air Intake. | PPEI-Max-Flow-Piping |
| 17 | MDP 2011 - 2014 6.7L FORD POWERSTROKE EGR BYPASS | MPD-67-EGRD-11-14 |

| Ref No. | Product Name | Item Code |
|---|---|---|
| 18 | MDP 2011 - 2016 6.7L FORD POWERSTROKE EGR BYPASS | MPD-67-EGRD |
| 19 | Orion Diesel EGR Delete for Dodge Cummins 6.7L 2007.5-2012 | ORD-EGRD-6.7C-07-12 |
| 20 | Orion Diesel EGR Delete for Dodge Cummins 6.7L 2013-2017 | ORD-EGRD-6.7C-13-17 |
| 21 | Package Deal - LML EGR Delete (EZ LYNK) | EGRD-WITH-UP-PIPE-1.2 |
| 22 | PPEI LML Max Flow Bridge, Hot Side tube, Cold side Tube, Turbo Inlet, Cold Air Intake | PPEI-Max-Flow-Piping |
| 23 | Sinister Diesel EGR Delete Kit (Uses Aftermarket 1/8" NPT EGT Probe) for Ford Powerstroke 2011-2014 6.7L SD-EGRD-6.7P-NPT | SD-EGRD-6.7P-NPT |
| 24 | Sinister Diesel EGR Delete Kit for GM Duramax 2011-2012 6.6L LML | SD-EGRD-LML |
| 25 | Sinister Diesel EGR Delete Kit for GM Duramax 2011-2015 6.6L LML | SD-EGRD-LML |
| 26 | 11-17 Ford 6.7L Powerstroke FloPro SS753NB Dual 4" Stainless Downpipe Back Exhaust | SS753NB |
| 27 | 11-17 Powerstroke (Automatic) 4" Downpipe Back DUALS NO MUFFLER Aluminized - Part #753NB | 753NB |
| 28 | 2001 - 2007 Duramax 6.6L Flopro 4" Turbo Back Exhaust with Muffler | 801 |
| 29 | 2001-2007 Duramax 5" exhaust no muffler. | 601NM |
| 30 | 2011 - 2012 Cummins C&C Exhaust System | 21122 |
| 31 | 2013 - 2017 Cummins C&C Exhaust System | 21126 |
| 32 | 2013 + Cummins Flo~Pro 4" Aluminized with Muffler Coil Spring kit 1874 | 1874 |
| 33 | 2013 + Cummins Flo~Pro 4" Aluminized without Muffler Coil Spring kit 1873 | 1873 |
| 34 | 2013 + Cummins Flo~Pro 4" Stainless Steel with Muffler | SS1874 |

| Ref No. | Product Name | Item Code |
|---|---|---|
| | Coil Spring kit SS1874 | |
| 35 | 2013 + Cummins Flo~Pro 4" Stainless Steel without Muffler Coil Spring kit SS1873 | SS1873 |
| 36 | 2013 + Cummins Flo~Pro 5" Aluminized with Muffler Coil Spring kit 1674 | 1674 |
| 37 | 2013 + Cummins Flo~Pro 5" Aluminized without Muffler Coil Spring kit 1673 | 1673 |
| 38 | 2013 + Cummins Flo~Pro 5" Stainless Steel with Muffler Coil Spring kit SS1674 | SS1674 |
| 39 | 2013 + Cummins Flo~Pro 5" Stainless Steel without Muffler Coil Spring kit SS1673 | SS1673 |
| 40 | 2015.5 - 2016 LML Duramax 4" Stainless Steel FloPro Exhaust With Muffler SS871 | SS871 |
| 41 | 2015.5+ LML Duramax 5" Stainless Steel exhaust with muffler | SS671 |
| 42 | 2015.5+ LML Duramax 5" Stainless Steel exhaust without muffler | ss671nm |
| 43 | 2015.5+ LML Duramax 5" Stainless Steel exhaust without muffler SS671NM | SS671NM |
| 44 | 2016 - 2017 Nissan Titan XD 5.0 Cummins Flo~Pro Delete Pipe 879 | 879 |
| 45 | 2016-2017, 2.8L Duramax, 3" Cat & DPF Race Pipes Race Exhaust No Bungs, With Muffler | 875 |
| 46 | 3" Cat & DPF Race Pipes 2014-2017, 3.0L Jeep ECODIESEL, Race Exhaust (876) | 876 |
| 47 | 4" MBRP Down Pipe Back Exhaust System w/ Front Pipe w/o Muffler 07-10 Chevy/GMC 2500/3500 | C6004PLM |
| 48 | 4" MBRP Down Pipe Back Exhaust System w/o Bungs w/ Muffler & Tip 304SS 11-16 Ford F250/350/450 6.7L | C6262304 |
| 49 | 4" MBRP Down Pipe Back Exhaust System w/o Bungs w/ Muffler AL 11-15 Chevy/GMC 2500/3500 HD | C6044P |

42

| Ref No. | Product Name | Item Code |
|---|---|---|
| 50 | 4" MBRP Down Pipe Back Exhaust System w/o Bungs w/ Muffler and Tip 304SS 11-15 Chevy/GMC 2500/3500 | C6044304 |
| 51 | 4" MBRP Down Pipe Back Exhaust System w/o Bungs w/ Muffler-P Series 11-16 Ford F250/350/450 6.7L | C6262P |
| 52 | 4" MBRP Down Pipe Back Exhaust System w/o Bungs w/ Muffler-P Series 17 Ford F250/350/450 6.7L | C6292P |
| 53 | 4" MBRP Down Pipe Back Exhaust System w/o Bungs w/o Muffler AL 11-15 Chevy/GMC 2500/3500 HD | C6044PLM |
| 54 | 4" MBRP Down Pipe Back Exhaust System w/o Bungs w/o Muffler-PLM Series 11-16 Ford F250/350/450 6.7L | C6260PLM |
| 55 | 4" MBRP Down Pipe Back Exhaust System w/o Bungs w/o Muffler-PLM Series 17 Ford F250/350/450 6.7L | C6292PLM |
| 56 | 4" MBRP Down Pipe Back Race System Chev/GMC 2007-2010 | C6004P |
| 57 | 4" MBRP Pipe w/o Bungs AL 07-12 Dodge 2500/3500 6.7L | CDAL437 |
| 58 | 4" MBRP Pipe w/o Bungs AL 11-15 GM/Chevy 2500/3500 HD | CGMAL426 |
| 59 | 4" MBRP Pipe w/o Bungs AL 11-16 Ford F250/350/450 6.7L | CFAL458 |
| 60 | 4" MBRP Pipe w/o Bungs AL 17-UP Ford F250/350/450 6.7L | CFAL461 |
| 61 | 4" MBRP Pipe w/o Bungs T409 11-16 Ford F250/350/450 6.7L | CFS9458 |
| 62 | 5" MBRP Down Pipe Back Exhaust System w/o Bungs w/o Muffler 409 SS 11-15 Chevy/GMC 2500/3500 HD | C6048SLM |
| 63 | 5" MBRP Down Pipe Back Exhaust System w/o Bungs w/o Muffler AL 11-15 Chevy/GMC 2500/3500 HD | C6048PLM |
| 64 | 5" MBRP Down Pipe Back Exhaust System w/o Bungs w/o Muffler-PLM Series 11-16 Ford F250/350/450 6.7L | C6280PLM |
| 65 | 5" MBRP Down Pipe Back Exhaust System w/o Muffler AL 07-10 Chevy/GMC 2500/3500 | C6020PLM |

| Ref No. | Product Name | Item Code |
|---------|-------------|-----------|
| 66 | 5" MBRP Turbo Back Exhaust System w/o Bungs w/ Muffler AL 13-16 Dodge 2500/3500 w/ Coil or L Spring | C6147P |
| 67 | 5" MBRP Turbo Back Exhaust System w/o Bungs w/o Muffler 409 13-16 Dodge 2500 w/ Coil or Leaf Spring | C6147SLM |
| 68 | 5" MBRP Turbo Back Exhaust System w/o Bungs w/o Muffler AL 13-16 Dodge 2500 w/ Coil or Leaf Spring | C6147PLM |
| 69 | Chevrolet Cruze Diesel Down Pipe | Chevrolet Cruze Diesel Down Pipe |
| 70 | Dodge Cummins 2007 - 2009 Flo~Pro 1636 5" Exhaust With Muffler | 1636 |
| 71 | Dodge Cummins 2007 - 2009 Flo~Pro 1639 5" Exhaust With Out Muffler | 1639 |
| 72 | Dodge Cummins 2007 - 2009 Flo~Pro 1836 4" Exhaust with muffler | 1836 |
| 73 | Dodge Cummins 2007 - 2009 Flo~Pro 1839 4" Exhaust With Out Muffler | 1839 |
| 74 | Dodge Cummins 2007 - 2012 Flo~Pro 835NB Race Pipes | 835NB |
| 75 | Dodge Cummins 2010 - 2012 Flo~Pro 1648 5" Exhaust With Muffler | 1648 |
| 76 | Dodge Cummins 2010 - 2012 Flo~Pro 1649 5" Exhaust With Out Muffler | 1649 |
| 77 | Dodge Cummins 2010 - 2012 Flo~Pro 1848 4" Exhaust With Muffler | 1848 |
| 78 | Dodge Cummins 2010 - 2012 Flo~Pro 1849 4" Exhaust With Out Muffler | 1849 |
| 79 | Dodge Cummins 2011 - 2012 Flo~Pro 21123 C&C Race Pipe With Muffler | 21123 |
| 80 | Dodge Cummins 2011 - 2014 Flo~Pro 21122 C&C Race Pipe Without Muffler | 21122 |
| 81 | Dodge Cummins 2011 - 2014 Flo~Pro 21123 C&C Race Pipe With Muffler | 21123 |

| Ref No. | Product Name | Item Code |
|---|---|---|
| 82 | Dodge Cummins 2011 - 2014 Flo~Pro 21124 C&C Cab to Axle Length Equal to 60" Fits 2011+ Dodge Cab and Chassis | 21124 |
| 83 | Dodge Cummins 2011 - 2014 Flo~Pro 21125 C&C Cab to Axle Lengths Greater than 60" Fits 2011+ Dodge Cab and Chassis | 21125 |
| 84 | Dodge Cummins 2013 - 2015 Flo~Pro 1670 5" With Muffler No Bungs | 1670 |
| 85 | Dodge Cummins 2013 - 2015 Flo~Pro 1869 4" Exhaust Without Muffler | 1869 |
| 86 | Dodge Cummins 2013 - 2015 Flo~Pro 1869 4" Exhaust Without Muffler | 1849 |
| 87 | Dodge Cummins 2013 - 2015 Flo~Pro 1870 4" Exhaust With Muffler No Bungs | 1870 |
| 88 | Dodge Cummins 2013 - 2015 Flo~Pro 5" Exhaust Without Muffler No Bungs - 1669 | 1669 |
| 89 | Dodge Cummins 2013 - 2015 Flo~Pro 868NB Race Pipes | 868NB |
| 90 | Dodge Cummins 2013 - 2017 Flo~Pro 868NB Race Pipes | 868NB |
| 91 | Dodge ECO Diesel 3.0L 2014 - 2015 FLO~PRO 863NB 3" DOWNPIPE BACK SINGLE SYSTEM WITHOUT MUFFLER | 863NB |
| 92 | Dodge ECO Diesel 3.0L 2014 - 2015 FLO~PRO 863NM 3" DOWNPIPE BACK SINGLE SYSTEM WITHOUT MUFFLER | 863NB |
| 93 | Flo Pro 27123 07-10 Dodge 6.7L Cab & Chassis DPF Delete Pipe | 27123 |
| 94 | Flo~Pro 2007.5 - 2010 GM DURAMAX CAB & CHASSIS 6.6L 4" DPF RACE KIT - REG CAB - 851 | 851 |
| 95 | Flo~Pro 2011 - 2015 Duramax 6.6L LML Flopro 4" CAT & DPF Delete Kit with Adapter SS862 | SS862 |
| 96 | Flo~Pro 645 - 5" EXHAUST NO BUNGS WITH MUFFLER C&C 2007-2010, 6.7L Cummins | 645 |

45

| Ref No. | Product Name | Item Code |
|---|---|---|
| | 3500/4500/5500 | |
| 97 | Flo~Pro 655 - 5" EXHAUST NO BUNGS WITH MUFFLER 2011-2012, 6.7L, 3500/4500/5500, Cab & Chassis, Race Exhaust | 655 |
| 98 | Flo~Pro 655 - 5" EXHAUST NO BUNGS WITH MUFFLER 2011-2017, 6.7L, 3500/4500/5500, Cab & Chassis, Race Exhaust | 655 |
| 99 | Flo~Pro 764 5" Aluminized Turbo Back Duals Fits 11-15 Chevy/GMC Duramax | 764 |
| 100 | Flo~Pro SS634NM 5" Stainless downpipe back exhaust w/o muffler | 07-10 6.6L Duramax LMM | SS634NM |
| 101 | Flo~Pro SS871NM 4"Stainless Downpipe Back Exhaust W/O Muffler 15.5+ Duramax | SS871NM |
| 102 | Flopro 2015.5+ Cat/DPF Delete Pipes (872) | 872 |
| 103 | Flopro 4" Aluminized Nissan Titan XD 5.0 Cummins exhaust with muffler (878) | 878 |
| 104 | Flopro 4" STAINLESS DOWNPIPE BACK SINGLE RACE EXHAUST SS834 | ss834 |
| 105 | Flopro 4" Stainless Steel Nissan Titan XD 5.0 Cummins exhaust with muffler (ss878) | ss878 |
| 106 | Flopro 5" Aluminized Nissan Titan XD 5.0 Cummins exhaust with muffler (678) | 678 |
| 107 | Flopro 5" Aluminized Nissan Titan XD 5.0 Cummins exhaust WITHOUT muffler (678nm) | 678nm |
| 108 | Flopro 5" Stainless Steel Nissan Titan XD 5.0 Cummins exhaust WITHOUT muffler (ss678nm) | ss678nm |
| 109 | FloPro SS1670 5" Stainless Steel Exhaust With Muffler 2013-2016 Cummins | SS1670 |
| 110 | Ford 6.4L Powerstroke 2008 - 2010 Flo~Pro 832NB 4" Exhaust with muffler | 832NB |
| 111 | Ford 6.4L Powerstroke 2008 - 2010 Flo~Pro 833NB 4" | 833NB |

46

| Ref No. | Product Name | Item Code |
|---|---|---|
| | Exhaust With Out muffler | |
| 112 | Ford 6.4L Powerstroke 2008 - 2010 Flo~Pro 837NB Race Pipes | 837NB |
| 113 | Ford 6.7L Exhaust (Package Deal) | SS653NB |
| 114 | Ford 6.7L Powerstroke 2011 - 2015 Flo~Pro 653NB 5" Exhaust With Out Muffler | 653NB |
| 115 | Ford 6.7L Powerstroke 2011 - 2015 Flo~Pro 857NB Race Pipes | 857NB |
| 116 | Ford 6.7L Powerstroke 2011 - 2016 Flo~Pro 652NB 5" Exhaust With Muffler | 652NB |
| 117 | Ford 6.7L Powerstroke 2011 - 2016 Flo~Pro 653NB 5" Exhaust With Out Muffler | 653NB |
| 118 | Ford 6.7L Powerstroke 2011 - 2016 Flo~Pro 852NB 4" Exhaust With Muffler | 852NB |
| 119 | Ford 6.7L Powerstroke 2011 - 2016 Flo~Pro 853NB 4" Exhaust With Out Muffler | 853NB |
| 120 | Ford 6.7L Powerstroke 2011 - 2016 Flo~Pro SS652NB 5" Exhaust With Muffler | SS652NB |
| 121 | Ford 6.7L Powerstroke 2011 - 2016 Flo~Pro SS653NB 5" Exhaust Without Muffler | SS653NB |
| 122 | Ford 6.7L Powerstroke 2011 - 2016 Flo~Pro SS852NB 4" Exhaust With Muffler | SS852NB |
| 123 | Ford 6.7L Powerstroke 2011 - 2016 Flo~Pro SS853NB 4" Exhaust Without Muffler | SS853NB |
| 124 | Ford 6.7L Powerstroke 2011 - 2017 Flo~Pro 652NB 5" Exhaust With Muffler | 652NB |
| 125 | Ford 6.7L Powerstroke 2011 - 2017 Flo~Pro 653NB 5" Exhaust With Out Muffler | 653NB |
| 126 | Ford 6.7L Powerstroke 2011 - 2017 Flo~Pro 852NB 4" Exhaust With Muffler | 852NB |

| Ref No. | Product Name | Item Code |
|---|---|---|
| 127 | Ford 6.7L Powerstroke 2011 - 2017 Flo~Pro 853NB 4" Exhaust With Out Muffler | 853NB |
| 128 | Ford 6.7L Powerstroke 2011 - 2017 Flo~Pro 857NB Race Pipes | 857NB |
| 129 | GM 6.6 DURAMAX 2011 - 2015 FLO~PRO SS664 5" STAINLESS EXHAUST WITH MUFFLER | SS664 |
| 130 | GM 6.6 DURAMAX 2011 - 2015 FLO~PRO SS664NM 5" STAINLESS EXHAUST WITHOUT MUFFLER | SS664NM |
| 131 | GM 6.6 DURAMAX 2011 - 2015 FLO~PRO SS864 4" STAINLESS EXHAUST WITH MUFFLER | SS864 |
| 132 | GM 6.6L Duramax 2007.5 - 2010 Flo~Pro 634 5" Exhaust With Muffler | 634 |
| 133 | GM 6.6L Duramax 2007.5 - 2010 Flo~Pro 634NM 5" Exhaust With Out Muffler | 634NM |
| 134 | GM 6.6L Duramax 2007.5 - 2010 Flo~Pro 634NM 5" Exhaust With Out Muffler | 634 |
| 135 | GM 6.6L Duramax 2007.5 - 2010 Flo~Pro 834 4" Exhaust With Muffler | 834 |
| 136 | GM 6.6L Duramax 2007.5 - 2010 Flo~Pro 834NM 4" Exhaust With Out Muffler | 834NM |
| 137 | GM 6.6L Duramax 2011 - 2015 Flo~Pro 664 5" Exhaust With Muffler | 664 |
| 138 | GM 6.6L Duramax 2011 - 2015 Flo~Pro 664NM 5" Exhaust With Out Muffler | 664NM |
| 139 | GM 6.6L Duramax 2011 - 2015 Flo~Pro 862 Race Pipes | 862 |
| 140 | GM 6.6L Duramax 2011 - 2015 Flo~Pro 864 4" Exhaust With Muffler | 864 |
| 141 | GM 6.6L Duramax 2011 - 2015 Flo~Pro 864NM 4" Exhaust With Out Muffler | 864NM |
| 142 | GM 6.6L Duramax 2011 - 2015 Flo~Pro SS864NM 4" Exhaust With Out Muffler | SS864NM |

| Ref No. | Product Name | Item Code |
|---|---|---|
| 143 | GM 6.6L Duramax 2015.5 + FLO~PRO 671 5" DOWNPIPE BACK SINGLE SYSTEM WITH MUFFLER | 671 |
| 144 | GM 6.6L Duramax 2015.5 + FLO~PRO 671NM 5" DOWNPIPE BACK SINGLE SYSTEM WITHOUT MUFFLER | 671NM |
| 145 | GM 6.6L Duramax 2015.5 + FLO~PRO 771 4" DOWNPIPE BACK DUAL SYSTEM WITHOUT MUFFLER 771 | 771 |
| 146 | GM 6.6L Duramax 2015.5 + FLO~PRO 871 4" DOWNPIPE BACK SINGLE SYSTEM WITH MUFFLER 871 | 871 |
| 147 | GM 6.6L Duramax 2015.5 + FLO~PRO 871NM 4" DOWNPIPE BACK SINGLE SYSTEM WITHOUT MUFFLER 871NM | 871NM |
| 148 | LML Down Pipe (2011 - 2014) | GM8427 |
| 149 | Package Deal LML 11-15 Duramax Exhaust | 664NM |
| 150 | 2001 - 2010 Duramax PPEI Autocal | 10073 |
| 151 | 2006 - 2009 CSP5 Tuning | 10059 |
| 152 | 2006 - 2009 Cummins PPEI AutoCal | 10066 |
| 153 | 2010 - 2012 6.7L CSP5 Tuning | 10214 |
| 154 | 2010 - 2012 6.7L Cummins Single Tune | 10015 |
| 155 | 2010 - 2012 6.7L Cummins Tune Pack | 10214 |
| 156 | 2010 - 2012 Cummins Package Deal | CMDPD |
| 157 | 2010 - 2012 Cummins Single Tune AutoCal | 10029 |
| 158 | 2010-2015 Cummins CSP4 & CSP5 Upgrade | 6.7CSP5 |
| 159 | 2013 - 2015 6.7L CSP4 Tuning | 10207 |
| 160 | 2013 - 2015 6.7L Cummins Single Tune | 10090 |
| 161 | 2013 - 2015 6.7L Cummins Tune Pack | 10207, 10208, 10209, 10214, 10215, 10216, 10218 |

49

| Ref No. | Product Name | Item Code |
|---|---|---|
| 162 | 2013 - 2015 Cummins Single Tune AutoCal | 10022 |
| 163 | 2013 - 2016 Cummins Package Deal | CMEPD |
| 164 | 2013 - 2017 Cummins Package Deal | CMEPD |
| 165 | 6L50 TCM Tuning - 2.8L Duramax | 6L50-TCM |
| 166 | 6L50 TCM Tuning - 2.8L LWN Duramax | 6L50-TCM |
| 167 | Intentionally left blank | |
| 168 | Bench Flash | BF |
| 169 | Big Rig Tuning | Big-Rig-Tuning |
| 170 | CSP5 - Level 1 | CSP5 LEV 1 |
| 171 | CSP5 - Level 2 | CSP5 LEV 2 |
| 172 | CSP5 - Level 3 | CSP5 LEV 3 |
| 173 | CSP5 Upgrade | CSP5A Upgrade-CW, CSP5Upgrade, 10275, CSP5A Upgrade, 10277, 10276 |
| 174 | Cummins 6.7 - Level 1 - 3 Tune Pack | Cummins 6.7 Level 1 - 3 Tune Pack |
| 175 | Cummins Single Tune - Stock/Built Trans | Cummins Single Tune |
| 176 | Cummins Version 1.2 CSP Update | v1.2 Upgrade |
| 177 | Dealer Only - EZ LYNK Support Profile Packs / Single Support Profiles | Dealer-EZ-Lynk-Support-Profiles |
| 178 | DSP5 - Level 1 | DSP5 - Level 1, DSP5 - Level 1 Switch |
| 179 | DSP5 - Level 2 | DSP5 - Level 2, DSP5 - Level 2 Switch |
| 180 | DSP5 - Level 3 | DSP5 - Level 3, DSP5 - Level 3 Switch |
| 181 | DSP5 Tuning | 10043 |

50

| Ref No. | Product Name | Item Code |
|---|---|---|
| 182 | Duramax Single Tune - Stock/Built Trans | 10489 |
| 183 | Duramax Single Tune - Stock/Built Trans | 10489 |
| 184 | ECO Diesel ECM Tuning | ECODiesel |
| 185 | Emissions Upgrade | 10290 |
| 186 | EZ LYNK With PPEI Support Pack | SUPPORT-PACK-DEFAULT-1 |
| 187 | H&S XRT All You Need | 109006, 109006R, 109006-L1 |
| 188 | LML EZ LYNK Package Deal | LML EZ LYNK Package |
| 189 | LML Package Deal | LMLPD |
| 190 | LML Single Tune | 10311 |
| 191 | LML Single Tune AutoCal | 10036 |
| 192 | LML Tune - 5 pack | 10304 |
| 193 | LMM Package Deal | LMMPD |
| 194 | LVL 1 Package Tune Exhaust & Lift Pump | LVL1 |
| 195 | MCC Single Tune | 10221 |
| 196 | MCC Tuning - Level 1 | 209007B |
| 197 | MCC Tuning - Level 2 | 209007B |
| 198 | MCC Tuning - Level 3 | 209007B |
| 199 | Mini with All You Need | 209007B, 209007R |
| 200 | MM | 209007 |
| 201 | PPEI 2010 - 2012 Cummins 6.7L AutoCal | 10155 |
| 202 | PPEI 2013 - 2015 Cummins 6.7L AutoCal | 10109 |
| 203 | PPEI Autocal - Level 1 | ATC Level 1 |
| 204 | PPEI Autocal - Level 2 | ATC Level 2 |
| 205 | PPEI Autocal - Level 3 | ATC Level 3 |

| Ref No. | Product Name | Item Code |
|---------|--------------|-----------|
| 206 | PPEI Autocal - LML - Level 2 | PPEI Autocal - LML - Level 2 |
| 207 | PPEI Autocal - LML - Level 3 | PPEI Autocal - LML - Level 3 |
| 208 | PPEI Autocal - LML Tuning | 10318 |
| 209 | PPEI Cummins 6.7L AutoCal | PPEI6.7L |
| 210 | PPEI Support Profile(s) | Dealer PPEI Support Pack |
| 211 | Single Tune AutoCal 2001 - 2010 Duramax | 10083 |
| 212 | 2017+ 5" Ford 409SS Race Exhaust No Muffler With Tip | F507DB-MD |
| 213 | 2017+ 5" Ford 409SS Race Exhaust With Muffler With Tip | F507DB |
| 214 | 2003.5-2007 5" Ford 409SS Race Exhaust No Muffler With Tip | F503TB-MD |
| 215 | 2003.5-2007 5" Ford 409SS Race Exhaust With Muffler With Tip | F503TB |
| 216 | 2011+ 4" Ford 409SS Competition Race Pipe (Front and mid section with gaskets, bolts and clamps) | F005RP |
| 217 | 2008-2010 4" Ford 409SS Competition Race Pipe (Front and mid section with gasket, bolts and clamps) | F004RP |
| 218 | 2003-2007 4" Ford 409SS Race Exhaust No Muffler With Tip | F003TB-MD |
| 219 | 2003-2007 4" Ford 409SS Race Exhaust With Muffler With Tip | F003TB |
| 220 | 2003-2004 5" Dodge 409SS Race Exhaust No Muffler With Tip | D502TB-MD |
| 221 | 2003-2004 5" Dodge 409SS Race Exhaust With Muffler With Tip | D502TB |
| 222 | 2007.5- 2019 4" Dodge 409SS Competition Race Pipe (Downpipe and mid section with clamps) | D004RP |
| 223 | 2015.5-2016 4" GM 409SS Competition Race Pipe (3-bolt Flange)(Front and mid section with clamps) | C005RP |

| Ref No. | Product Name | Item Code |
|---|---|---|
| 224 | 2011-2015 4" GM 409SS Competition Race Pipe (V-Band Flange)(Front and mid section with clamps) | C004RP |
| 225 | 2007.5-2010 4" GM 409SS Competition Race Pipe Short Bed (With gaskets and bolts) Front pipe not included | C003RPS |
| 226 | 2007.5-2010 4" GM 409SS Competition Race Pipe Long Bed (With gaskets and bolts) Front pipe not included | C003RPL |
| 227 | 2008-2010 5" Ford Aluminized Race Exhaust No Muffler No Tip | AF504DB-MD |
| 228 | 2008-2010 5" Ford Aluminized Race Exhaust With Muffler No Tip | AF504DB |
| 229 | 2003.5-2007 5" Ford Aluminized Race Exhaust No Muffler No Tip | AF503TB-MD |
| 230 | 2003.5-2007 5" Ford Aluminized Race Exhaust With Muffler No Tip | AF503TB |
| 231 | 2008-2010 4" Ford Aluminized Competition Race Pipe (Front and mid-section with gasket, bolts and clamps) | AF004RP |
| 232 | 2003-2007 4" Ford Aluminized Race Exhaust No Muffler No Tip | AF003TB-MD |
| 233 | 2003-2007 4" Ford Aluminized Race Exhaust With Muffler No Tip | AF003TB |
| 234 | 2003-2004 5" Dodge Aluminized Race Exhaust No Muffler No Tip | AD502TB-MD |
| 235 | 2003-2004 5" Dodge Aluminized Race Exhaust With Muffler No Tip | AD502TB |
| 236 | 2003-2004 4" Dodge Aluminized Race Exhaust No Muffler No Tip | AD002TB-MD |
| 237 | 2003-2004 4" Dodge Aluminized Race Exhaust With Muffler No Tip | AD002TB |
| 238 | 2007.5-2010 5" GM Aluminized Race Exhaust With Muffler No Tip | AC503DB |
| 239 | 2017+ 5" Ford Aluminized Race Exhaust No Muffler No Tip | AF507DB-MD |

| Ref No. | Product Name | Item Code |
|---|---|---|
| 240 | 2017+ 5" Ford Aluminized Race Exhaust With Muffler No Tip | AF507DB |
| 241 | 2011-2016 5" Ford Aluminized Race Exhaust No Muffler No Tip | AF505DB-MD |
| 242 | 2011-2016 5" Ford Aluminized Race Exhaust With Muffler No Tip | AF505DB |
| 243 | 2013-2019 5" Dodge Aluminized Race Exhaust No Muffler No Tip | AD506TB-MD |
| 244 | 2013-2019 5" Dodge Aluminized Race Exhaust With Muffler No Tip | AD506TB |
| 245 | 2010-2012 5" Dodge Aluminized Race Exhaust No Muffler No Tip | AD505TB-MD |
| 246 | 2010-2012 5" Dodge Aluminized Race Exhaust With Muffler No Tip | AD505TB |
| 247 | 2007.5-2009 5" Dodge Aluminized Race Exhaust No Muffler No Tip | AD504TB-MD |
| 248 | 2007.5-2009 5" Dodge Aluminized Race Exhaust With Muffler No Tip | AD504TB |
| 249 | 2004.5-2007 5" Dodge Aluminized Race Exhaust No Muffler No Tip | AD503TB-MD |
| 250 | 2004.5-2007 5" Dodge Aluminized Race Exhaust With Muffler No Tip | AD503TB |
| 251 | 2015.5-2016 5" GM Aluminized Race Exhaust No Muffler (3 Bolt Flange) No Tip | AC505DB-MD |
| 252 | 2015.5-2016 5" GM Aluminized Race Exhaust With Muffler (3 Bolt Flange) No Tip | AC505DB |
| 253 | 2011-2015 5" GM Aluminized Race Exhaust No Muffler (V-Band Flange) No Tip | AC504DB-MD |
| 254 | 2011-2015 5" GM Aluminized Race Exhaust With Muffler (V-Band Flange) No Tip | AC504DB |
| 255 | 2007.5-2010 5" GM Aluminized Race Exhaust No Muffler No Tip | AC503DB-MD |

| Ref No. | Product Name | Item Code |
|---|---|---|
| 256 | 2001-2007 5" GM Aluminized Race Exhaust No Muffler No Tip | AC502DB-MD |
| 257 | 2001-2007 5" GM Aluminized Race Exhaust With Muffler No Tip | AC502DB |
| 258 | 2011-2019 4" Ford Aluminized Race Exhaust No Muffler No Tip | AF005DB-MD |
| 259 | 2011-2019 4" Ford Aluminized Race Exhaust With Muffler No Tip | AF005DB |
| 260 | 2013-2019 4" Dodge Aluminized Race Exhaust No Muffler No Tip | AD006TB-MD |
| 261 | 2013-2019 4" Dodge Aluminized Race Exhaust With Muffler No Tip | AD006TB |
| 262 | 2010-2012 4" Dodge Aluminized Race Exhaust No Muffler No Tip | AD005TB-MD |
| 263 | 2010-2012 4" Dodge Aluminized Race Exhaust With Muffler No Tip | AD005TB |
| 264 | 2007.5-2009 4" Dodge Aluminized Race Exhaust No Muffler No Tip | AD004TB-MD |
| 265 | 2007.5-2009 4" Dodge Aluminized Race Exhaust With Muffler No Tip | AD004TB |
| 266 | 2015.5-2016 4" GM Aluminized Race Exhaust No Muffler (3 Bolt Flange) No Tip | AC005DB-MD |
| 267 | 2015.5-2016 4" GM Aluminized Race Exhaust With Muffler (3 Bolt Flange) No Tip | AC005DB |
| 268 | 2011-2015 4" GM Aluminized Race Exhaust No Muffler (V-Band Flange) No Tip | AC004DB-MD |
| 269 | 2011-2015 4" GM Aluminized Race Exhaust With Muffler (V-Band Flange) No Tip | AC004DB |
| 270 | 2007.5-2010 4" GM Aluminized Race Exhaust No Muffler No Tip | AC003DB-MD |
| 271 | 2007.5-2010 4" GM Aluminized Race Exhaust With Muffler No Tip | AC003DB |

| Ref No. | Product Name | Item Code |
|---|---|---|
| 272 | 2001-2007 4" GM Aluminized Race Exhaust No Muffler No Tip | AC002DB-MD |
| 273 | 2001-2007 4" GM Aluminized Race Exhaust With Muffler No Tip | AC002DB |
| 274 | 2011+ 4" Ford Aluminized Competition Race Pipe (Front and mid-section with gaskets, bolts and clamps) | AF005RP |
| 275 | 2007.5- 2019 4" Dodge Aluminized Competition Race Pipe (Downpipe and mid-section with clamps) | AD004RP |
| 276 | 2017+ 4" GM Aluminized Competition Race Pipe (4-Bolt Flange)(Front and mid-section with clamps) | AC006RP |
| 277 | 2015.5-2016 4" GM Aluminized Competition Race Pipe (3-Bolt Flange)(Front and mid-section with clamps) | AC005RP |
| 278 | 2011-2015 4" GM Aluminized Competition Race Pipe (V-Band Flange)(Front and mid-section with clamps) | AC004RP |
| 279 | 2007.5-2010 4" GM Aluminized Competition Race Pipe Long Bed (With gaskets and bolts) | AC003RPL |
| 280 | 2007.5-2010 4" GM Aluminized Competition Race Pipe Short Bed (With gaskets and bolts) | AC003RPS |
| 281 | 2011-2016 5" Ford 409SS Race Exhaust No Muffler With Tip | F505DB-MD |
| 282 | 2011-2016 5" Ford 409SS Race Exhaust With Muffler With Tip | F505DB |
| 283 | 2008-2010 5" Ford 409SS Race Exhaust No Muffler With Tip | F504DB-MD |
| 284 | 2008-2010 5" Ford 409SS Race Exhaust With Muffler With Tip | F504DB |
| 285 | 2013-2019 5" Dodge 409SS Race Exhaust No Muffler With Tip | D506TB-MD |
| 286 | 2013-2019 5" Dodge 409SS Race Exhaust With Muffler With Tip | D506TB |
| 287 | 2010-2012 5" Dodge 409SS Race Exhaust No Muffler With Tip | D505TB-MD |

| Ref No. | Product Name | Item Code |
|---------|-------------|-----------|
| 288 | 2010-2012 5" Dodge 409SS Race Exhaust With Muffler With Tip | D505TB |
| 289 | 2007.5-2009 5" Dodge 409SS Race Exhaust No Muffler With Tip | D504TB-MD |
| 290 | 2007.5-2009 5" Dodge 409SS Race Exhaust With Muffler With Tip | D504TB |
| 291 | 2004.5-2007 5" Dodge 409SS Race Exhaust No Muffler With Tip | D503TB-MD |
| 292 | 2004.5-2007 5" Dodge 409SS Race Exhaust With Muffler With Tip | D503TB |
| 293 | 2015.5-2016 5" GM 409SS Race Exhaust No Muffler (3 Bolt Flange) With Tip | C505DB-MD |
| 294 | 2015.5-2016 5" GM 409SS Race Exhaust With Muffler (3 Bolt Flange) With Tip | C505DB |
| 295 | 2011-2015 5" GM 409SS Race Exhaust No Muffler (V-Band Flange) With Tip | C504DB-MD |
| 296 | 2011-2015 5" GM 409SS Race Exhaust With Muffler (V-Band Flange) With Tip | C504DB |
| 297 | 2007.5-2010 5" GM 409SS Race Exhaust No Muffler With Tip | C503DB-MD |
| 298 | 2007.5-2010 5" GM 409SS Race Exhaust With Muffler With Tip | C503DB |
| 299 | 2001-2007 5" GM 409SS Race Exhaust No Muffler With Tip | C502DB-MD |
| 300 | 2001-2007 5" GM 409SS Race Exhaust With Muffler With Tip | C502DB |
| 301 | 2011-2019 4" Ford 409SS Race Exhaust No Muffler With Tip | F005DB-MD |
| 302 | 2011-2019 4" Ford 409SS Race Exhaust With Muffler With Tip | F005DB |
| 303 | 2008-2010 4" Ford 409SS Race Exhaust No Muffler With Tip | F004DB-MD |

| Ref No. | Product Name | Item Code |
|---------|--------------|-----------|
| 304 | 2008-2010 4" Ford 409SS Race Exhaust With Muffler With Tip | F004DB |
| 305 | 2013-2019 4" Dodge 409SS Race Exhaust No Muffler With Tip | D006TB-MD |
| 306 | 2013-2019 4" Dodge 409SS Race Exhaust With Muffler With Tip | D006TB |
| 307 | 2010-2012 4" Dodge 409SS Race Exhaust No Muffler With Tip | D005TB-MD |
| 308 | 2010-2012 4" Dodge 409SS Race Exhaust With Muffler With Tip | D005TB |
| 309 | 2007.5-2009 4" Dodge 409SS Race Exhaust No Muffler With Tip | D004TB-MD |
| 310 | 2007.5-2009 4" Dodge 409SS Race Exhaust With Muffler With Tip | D004TB |
| 311 | 2004.5-2007 4" Dodge 409SS Race Exhaust No Muffler With Tip | D003TB-MD |
| 312 | 2004.5-2007 4" Dodge 409SS Race Exhaust With Muffler With Tip | D003TB |
| 313 | 2015.5-2016 4" GM 409SS Race Exhaust No Muffler (3 Bolt Flange) With Tip | C005DB-MD |
| 314 | 2015.5-2016 4" GM 409SS Race Exhaust With Muffler (3 Bolt Flange) With Tip | C005DB |
| 315 | 2011-2015 4" GM 409SS Race Exhaust No Muffler (V-Band Flange) With Tip | C004DB-MD |
| 316 | 2011-2015 4" GM 409SS Race Exhaust With Muffler (V-Band Flange) With Tip | C004DB |
| 317 | 2007.5-2010 4" GM 409SS Race Exhaust No Muffler With Tip | C003DB-MD |
| 318 | 2007.5-2010 4" GM 409SS Race Exhaust With Muffler With Tip | C003DB |
| 319 | 2001-2007 4" GM 409SS Race Exhaust No Muffler With Tip | C002DB-MD |

| Ref No. | Product Name | Item Code |
|---|---|---|
| 320 | 2001-2007 4" GM 409SS Race Exhaust With Muffler With Tip | C002DB |
| 321 | EZ LYNK Custom Tuning | EZ-SUPP-PK-UNLIMITED |
| 322 | EZ LYNK Custom Tuning | EZ-SUPP-PK-LIMITED |
| 323 | EZ LYNK AutoAgent w/ Custom Tuning | EZ-XWS-UNLIMITED |
| 324 | EZ LYNK AutoAgent w/ Custom Tuning | EZ-XWS-LIMITED |

# APPENDIX B:

# Notice to Customers

## Appendix B: Notice to Customers and Authorized Dealers

[Print on PPEI LETTERHEAD]


Dear [Customer Name or Authorized Dealer Name]:

We are writing to make you aware of important changes in the type of products sold by Power Performance Enterprises, Inc. ("PPEI") and Mr. Kory Willis.  According to our records, you purchased certain PPEI aftermarket performance products.  For purposes of this letter, these products are hereinafter referred to as "Subject Products."

As you may already know, starting in 2019 PPEI and Mr. Willis began suspending all manufacturing and sales of Subject Products. PPEI and Mr. Willis suspended those sales because the U.S. EPA alleged that the manufacture and sale of Subject Products violated the Clean Air Act's prohibition against motor vehicle parts or components that allow for bypassing, defeating or rendering inoperative any emissions control system or element of design on a vehicle. *See* 42 U.S.C. §7522(a)(3).  Emissions control systems include the diesel particulate filter, exhaust gas recirculation system, catalysts, and onboard diagnostic system.

PPEI and Mr. Willis recently entered into a civil judicial settlement with EPA to resolve disputes regarding its manufacturing, sale and installation of Subject Products. Although PPEI and Mr. Willis have not admitted liability for violating the Clean Air Act, as part of the settlement, they have agreed that, among other things, they will no longer (1) manufacture, sell, or install the Subject Products or (2) provide technical support (e.g., telephone support, online/chat support, warranty support) for the Subject Products. PPEI and Mr. Willis have also agreed to provide you with this notice.

PPEI and Mr. Willis's settlement with the U.S. EPA specifically allows for PPEI and Mr. Willis to continue selling products covered by Executive Orders issued by the California Air Resources Board ("CARB") or certain pending applications for CARB Executive Orders.


Sincerely,


Kory Blaine Willis

# APPENDIX C:

# Notice to Employees

# Appendix C: Notice to Employees

**NOTICE OF CAA PROVISIONS AND CONSENT DECREE IN:**

*United States*
*v.*
*Power Performance Enterprises Inc. and Kory Blaine Willis*

TO: ALL OFFICERS, DIRECTORS, AND EMPLOYEES OF PPEI or Mr. Kory Willis:

PPEI and Mr. Willis have entered into a civil judicial settlement with the federal government regarding the manufacture, sale, and installation of certain aftermarket performance products that the United States Environmental Protection Agency ("EPA") alleged violated the Clean Air Act. Section 203 of the Clean Air Act prohibits the manufacture, sale, and installation of parts or components where a principal effect of the part or component is to bypass, defeat, or render inoperative emission control devices or elements of design, such as diesel particulate filters, exhaust gas recirculation systems, and onboard diagnostic system. PPEI and Mr. Willis have agreed to cease manufacturing, selling and offering to sell these products.

**42 U.S. Code Section 7522**

**(a) Enumerated prohibitions**

The following acts and the causing thereof are prohibited—

(3)(A) for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser; or

(3)(B) for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use

Anyone who undertakes any of the actions prohibited by Section 7522(a)(3)(A) or (B) of the Clean Air Act, or who offers for sale, sells, conveys, or otherwise transfers in any way the design, technology, or manufacturing processes or techniques used to manufacture the products identified above may be subject to a civil action under the Clean Air Act.

# APPENDIX D:
# Financial Information

## Financial Documentation Provided by PPEI and Mr. Willis

| Financial Documentation |
|---|
| PPEI Sales Ledger, 8/15/2013 through 10/28/2015 |
| Responses to CAA Section 208 Information Requests |
| Federal Tax Return Filing for CIPIA Inc, 2017, 2018 |
| Federal Tax Return Filing for Custom Calibrations Inc. f/k/a HPP Tuning Inc., 2016-2019 |
| Federal Tax Return Filing for Kinder Rental Fun Jumps Inc, 2016-2019 |
| Federal Tax Return Filing for KoryWillis.com, 2018, 2019 |
| Federal Tax Return Filing for PowerEnergyGroup.com, 2018, 2019 |
| Federal Tax Return Filing for Power Management Group, 2017, 2018 |
| Federal Tax Return Filing for PPEI, 2013-2019 |
| Federal Tax Return Filing for Kory B. Willis, 2013-2019 |
| Federal Tax Return Filing for Infinite Limits, LLC, 2019 |
| QuickBooks Export of Pro Forma Profit and Loss for PPEI, January - November 2020 |
| QuickBooks Export of Pro Forma Profit and Loss for PPEI, January - December 2019 |
| PPEI - Profit & Loss Detail - October 2019 through May 2021 |
| PPEI - Profit & Loss  - October 2019 through May 2021 |
| Email correspondence, market valuation reports, and appraisal reports re: property valuation |
| Cayman Islands Bank Statements |
| Microsoft Excel summary of current balances of certain bank accounts |
| Investment Account statements |
| Bank Statements |
| Bank Statements (Loans) |
| Bank Statements (Mortgages) |
| SBA Disaster Loan statement |
| SBA PPP Loan Statement |
| PPP Application form |
| Divorce agreement for property valuation |
| Spreadsheet summary of Cayman Island Units purchase and anticipated sales prices |
| Cayman property sales documentation |
| Documentation related to PPEI's additional obligations with respect to R&D and testing costs |
| Combined Cash Flow Detail for PPEI and All Related Entities (April 2020 – March 2021) |

| Financial Documentation |
|---|
| Cayman Islands Yearly Expense Estimate |
| Annual to Actual Loans Listing |